Robert McCAUGHTRY,
et al., Appellants,

v.

CITY OF RED WING, Respondent.

No. A10–0332.

Supreme Court of Minnesota.

May 31, 2013.

Anthony B. Sanders, Lee U. McGrath, Institute for Justice Minnesota Chapter, Minneapolis, MN; and Dana Berliner, Institute for Justice, Arlington, VA, for appellants.

John M. Baker, Kathryn N. Hibbard, Katherine M. Swenson, Greene Espel PLLP, Minneapolis, MN, for respondent.

Teresa Nelson, American Civil Liberties Union of Minnesota, Saint Paul, MN, for amicus curiae American Civil Liberties Union of Minnesota.

Patrick J. Kelly, Patrick J. Kelly Attorney at Law, P.A., Saint Paul, MN; and Bennett Evan Cooper, Steptoe & Johnson LLP, Phoenix, AZ, for amici curiae Cato Institute, Reason Foundation, Minnesota Free Market Institute at the Center of the American Experiment, Electronic Frontier Foundation, and Libertarian Law Council.

Susan L. Naughton, League of Minnesota Cities, Saint Paul, MN, for amicus curiae League of Minnesota Cities.

Jarod M. Bona, Ann A. Parmley, DLA Piper LLP, Minneapolis, MN, for amicus curiae Saint Paul Association of Responsible Landlords.

Nicole L. Concordia, Concordia Law Group PLLC, Minnetonka, MN, for amicus curiae Wiebesick Rental.

## OPINION

PAGE, Justice.

This case involves a facial challenge to the constitutionality of respondent City of

Red Wing's rental property inspection ordinance. Appellants are nine landlords and two tenants who brought suit seeking a declaration that the City's ordinance violates Article I, Section 10, of the Minnesota Constitution. The district court granted summary judgment in favor of the City, concluding that appellants lacked standing and that the state constitutional claim failed on the merits. Agreeing with the district court that appellants lacked standing, the court of appeals affirmed. We reversed, holding that appellants' facial challenge presented a justiciable controversy. *McCaughtry v. City of Red Wing,* 808 N.W.2d 331 (Minn.2011) (*McCaughtry I*). On remand, the court of appeals again affirmed the district court, this time concluding that the City's ordinance did not violate the Minnesota Constitution. Because appellants have not satisfied their burden in a facial challenge to show that the ordinance operates unconstitutionally in all of its applications, we affirm.

In February 2005, the City enacted a rental inspection and licensing ordinance as part of its Housing Maintenance Code (HMC) and Rental Dwelling Licensing Code (RDLC).[1] *See* Red Wing, Minn., City Code §§ 4.03–.04 (2012). The HMC establishes minimum standards to which all residential buildings (with certain limited exceptions) must conform. *See id.* § 4.03, subd. 5. The RDLC, in turn, prohibits any person from operating or leasing a rental dwelling unit without first having obtained an operating license from the City, although landlords may obtain temporary permits allowing them to lease property for which an operating license has not yet been issued. *Id.* § 4.04, subd. 1(A) & 1(A)(1). Operating licenses are valid for 7 years. *Id.* § 4.04, subd. 1(A)(2).

But the City may not issue or renew an operating license unless it determines that the rental property conforms to the HMC. *Id.* § 4.04, subd. 1(C).

The RDLC grants the City authority to inspect residential property under certain circumstances. First, the City may inspect all residential property, whether rental property or owner-occupied property, "when reason exists to believe that a violation of an applicable subdivision of the HMC exists, has been, or is being committed." *Id.* § 4.04, subd. 1(C) & 1(C)(3). Second, the City may also inspect rental property (1) "upon receipt of a properly executed application for an operating license," *id.,* § 4.04, subd. 1(C)(2), or (2) "on a scheduled basis," *id.* § 4.04, subd. 1(C) & 1(C)(1). The ordinance refers to inspections performed on a scheduled basis or upon receipt of an application for an operating license as "Licensing Inspections." *Id.* § 4.04, subd. 1(C)(2).

When the City conducts a Licensing Inspection, it must first seek consent to inspect from the owner and tenant. *Id.* § 4.04, subd. 1(C)(8). If consent cannot be obtained, the "City shall seek permission, from a judicial officer through an administrative warrant, for its enforcement officer or his or her agents to conduct an inspection." *Id.* § 4.04, subd. 1(C)(9). The ordinance does not describe the procedures for seeking a warrant or the conditions under which a warrant should be granted. Rather, the ordinance simply provides that "[n]othing in this Code shall limit or constrain the authority of the judicial officer to condition or limit the scope of the administrative warrant." *Id.*

After adoption of the rental inspection and licensing ordinance, the City contacted

---

1. We previously summarized the factual and procedural background of this case in *McCaughtry I* and we need not recount that entire background here. Instead, we recite only those facts relevant to our decision.

appellants seeking consent to inspect their rental properties. But appellants refused to consent, and the City sought administrative warrants against them in Goodhue County District Court. Appellants opposed the warrant applications and brought two declaratory judgment actions challenging the RDLC on several grounds. In particular, appellants claimed that the RDLC's warrant procedure violated Article I, Section 10, of the Minnesota Constitution because it authorized the City to obtain a search warrant without individualized suspicion of a housing code violation on appellants' property. Appellants acknowledged that, in *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Supreme Court held that the Fourth Amendment does not require that a warrant to conduct a housing code inspection be based on knowledge of the particular dwelling to be inspected. *Id.* at 538, 87 S.Ct. 1727. But appellants argued that the Minnesota Constitution should be interpreted more broadly than its federal counterpart so as to require individualized suspicion before a court may issue an administrative warrant. Appellants' declaratory judgment actions were consolidated with the City's administrative warrant applications. The City moved for summary judgment, challenging both the merits of appellants' constitutional claim and their standing to assert the claim.

The district court denied the City's warrant applications on federal constitutional grounds not relevant here. But the court granted summary judgment to the City on the declaratory judgment claims. The court concluded that, because appellants had not yet had an administrative warrant issued against them, they had "not suffered an injury that is actual or imminent." The district court also noted that "per the plain language of the RDLC," a judge reviewing an application for an administrative warrant "is specifically authorized to

condition or limit the scope of the warrant as appropriate." Thus, the district court concluded that an application for an administrative warrant "might possibly be approved in such a manner" that no constitutional violation occurs. But, in the interest of judicial economy, the district court nonetheless considered the merits of appellants' constitutional claim under Article I, Section 10, and denied that claim on the merits.

Appellants appealed, challenging the district court's ruling on both standing and the merits of their claim under the Minnesota Constitution. The court of appeals affirmed on standing grounds and did not address the merits of the constitutional claim. *See McCaughtry v. City of Red Wing*, No. A10–0332, 2010 WL 3744638, at *3–4 (Minn.App. Sept. 28, 2010). We granted review and reversed, determining that, because the relevant issue was "when" suit could be brought rather than "who" could bring it, the issue was one of ripeness, not standing. *McCaughtry I*, 808 N.W.2d at 338. We held that appellants' constitutional claim was ripe because they brought a purely legal, facial challenge to the RDLC that does not depend on the development of a factual record. *Id.* at 339. We therefore remanded the matter to the court of appeals for consideration of the merits of the constitutional challenge. *Id.* at 341. On remand, the court of appeals affirmed on the merits. *McCaughtry v. City of Red Wing*, 816 N.W.2d 636 (Minn.App.2012).

▮▮▮▮ The sole issue in this case is whether, on its face, the RDLC's Licensing Inspections provision violates Article I, Section 10, of the Minnesota Constitution, which prohibits unreasonable searches and seizures. Constitutional interpretation presents a legal question, which we review de novo. *State v. Brooks*, 604 N.W.2d 345,

348 (Minn.2000). We exercise our power to declare laws unconstitutional "with extreme caution and only when absolutely necessary." *In re Haggerty,* 448 N.W.2d 363, 364 (Minn.1989). A city "ordinance [is] presumed constitutional, and the burden of proving that [it is] unconstitutional is on the appellants." *Minn. Voters Alliance v. City of Minneapolis,* 766 N.W.2d 683, 688 (Minn.2009).

■ Because an administrative warrant has not yet been issued against them, appellants challenge the City's ordinance on its face, rather than as applied. We have stated that "in a facial challenge to constitutionality, the challenger bears the heavy burden of proving that the legislation is unconstitutional in all applications." *Id.* at 696; *see also United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (a facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid"); *McCaughtry I,* 808 N.W.2d at 339 (stating that a "facial challenge asserts that a law *'always* operates unconstitutionally' ") (quoting *Black's Law Dictionary* 261 (9th ed.2009)). The Supreme Court explained the rationale for this heavy burden:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. Finally, facial challenges threaten to short circuit the

democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.

*Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450–51, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (citations omitted) (internal quotation marks omitted). Thus, if we identify a single situation in which the RDLC's Licensing Inspection provision might be applied constitutionally, appellants' facial challenge fails. *See Minn. Voters Alliance,* 766 N.W.2d at 694 (stating that "[i]n a facial challenge, once a constitutional application is identified, it is inappropriate to speculate regarding other hypothetical circumstances that might arise"); Michael C. Dorf, *Facial Challenges to State and Federal Statutes,* 46 Stan. L.Rev. 235, 241 (1994) ("Under the 'no set of circumstances' test, the government need only produce an example in which the statute could be applied constitutionally to defeat the facial challenge.").

The crux of appellants' constitutional challenge is that the ordinance allows the City to obtain warrants to conduct Licensing Inspections without any individualized suspicion of a housing code violation. Whether the Minnesota Constitution requires individualized suspicion for housing code searches is an unsettled question. As discussed above, in order for us to resolve that question in the context of a facial challenge, appellants must first show that resolution of the question in their favor would render the ordinance unconstitutional in all of its applications. Stated differently, appellants must demonstrate that *every* warrant to conduct a Licensing Inspection under the RDLC will be issued without individualized suspicion. If a situation in which individualized suspicion might be required for a Licensing Inspection can be identified, then, even under

appellants' interpretation of the constitution, the ordinance would not be unconstitutional in all its applications and their facial challenge would fail.

Appellants argue that we endorsed the use of a facial challenge to the ordinance in our ruling in *McCaughtry I*. Appellants also argue that they can meet their burden in this case "because the text of the ordinance itself plainly authorizes 'administrative warrants' instead of warrants requiring traditional probable cause."[2] The City argues that appellants cannot meet their heavy burden because the RDLC does not preclude a judge from requiring individualized suspicion before issuing a warrant and thus, even under appellants' interpretation of Article I, Section 10, the ordinance is capable of being applied in a constitutional fashion.

We begin with appellants' claim that our decision in *McCaughtry I* is dispositive. In *McCaughtry I*, we held that appellants' claim was ripe because their facial challenge presented "a purely legal question that does not require the development of a factual record." 808 N.W.2d at 339. Because their challenge raised a "constitutional issue that … is neither hypothetical nor abstract," we concluded that "there [wa]s no reason to delay resolution of the constitutional question[ ]." *Id.* at 339–40. We also rejected the City's argument that the case was not ripe because a judge acts as gatekeeper for the issuance of an administrative warrant:

> In arguing that appellants' claims here are not justiciable, the City also relies on the fact that "a judge always stands between the City and its ability to conduct any inspection of Plaintiffs' properties." However, there is no probable cause or other standard set out in the ordinance, and the City essentially is arguing that appellants must wait and hope that a judge will "write in" the correct constitutional limitations on the warrant power. The possibility that a judge might in the future limit the City's administrative warrant application to ensure that the warrant comports with the Minnesota Constitution does not make the challenge here premature.

*Id.* at 341.

But *McCaughtry I* dealt with the specific issue of whether appellants' claims were unripe because a warrant had not yet been issued against them. Ripeness goes to the issue of justiciability, which is a threshold question in every case because it determines whether a court has jurisdiction to pass on the constitutionality of a law and issue a declaratory judgment. *See Kennedy v. Carlson*, 544 N.W.2d 1, 6 (Minn.1996) ("A justiciable controversy must exist before Minnesota courts have jurisdiction to issue a declaratory judgment regarding the constitutionality of a statute."); *see also Warth v. Seldin*, 422

**2.** Appellants' facial challenge asserts that the RDLC is unconstitutional because it does not comply with probable cause requirements. But the term "probable cause" in this context is imprecise. In *Camara*, the Supreme Court held under the federal constitution that administrative search warrants must be based on "probable cause," but that the probable cause required in this context means only that "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." 387 U.S. at 538, 87 S.Ct. 1727.

According to the Court, probable cause does "not necessarily depend upon specific knowledge of the condition of the particular dwelling." *Id.* Therefore, the most accurate understanding of appellants' complaint is not that the RDLC is unconstitutional because Licensing Inspections lack "probable cause" (as that term is defined in *Camara* ), but because Licensing Inspections are conducted without *individualized suspicion (i.e.,* traditional probable cause*)*. Therefore, we use the phrase "individualized suspicion" throughout this opinion rather than "probable cause."

U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Because the issue of justiciability goes to a court's power to hear a case at all, it is a separate and distinct question from the merits of the suit. We recognized this in *McCaughtry I* when we stated that, "[b]ecause the issue raised in this court is one of justiciability, 'we need not reach the merits of the underlying controversy at this time.'" 808 N.W.2d at 341 (quoting *Holiday Acres No. 3 v. Midwest Fed. Sav. & Loan Ass'n of Minneapolis,* 271 N.W.2d 445, 447 (Minn.1978)). Therefore, our statement in *McCaughtry I* that "there [wa]s no reason to delay resolution of the constitutional question[ ]" must be read in context. Likewise, although we held in *McCaughtry I* that the ability of a judge to limit the issuance of a warrant did not render a court without power to consider a facial challenge to the ordinance, we did not hold that appellants could or would be able to meet the requirements for a successful facial challenge on the merits. Accordingly, we reject appellants' argument that *McCaughtry I* is dispositive and controls here.

The present appeal is the first time that we have examined the *merits* of the facial challenge, and the first time we have considered the question of whether appellants can show that the RDLC is unconstitutional in all of its applications. Therefore, we turn to appellants' argument based on the text of the ordinance itself. The RDLC distinguishes between two types of inspections. First, both rental and owner-occupied property may be inspected for cause "when reason exists to believe that a violation of an applicable subdivision of the HMC exists, has been, or is being committed." Red Wing, Minn., City Code § 4.04, subd. 1(C) & 1(C)(3). Second, rental property may also be subjected to Licensing Inspections "on a scheduled basis," *id.* § 4.04, subd. 1(C) & 1(C)(1), or "upon receipt of a properly executed application for an operating license," *id.* § 4.04, subd. 1(C)(2). The RDLC explicitly requires that inspections for cause be based on individualized suspicion of a housing code violation, whereas Licensing Inspections contain no similar textual requirement. From this structure, appellants argue that the RDLC clearly contemplates that Licensing Inspections will occur without individualized suspicion. Moreover, appellants note that the RDLC uses the term "administrative warrant," which they argue is, by definition, a warrant issued without individualized suspicion.[3]

But the fact that the ordinance does not expressly require individualized suspicion for Licensing Inspections is not determinative of appellants' facial challenge. Appellants must show that *all* warrants to conduct Licensing Inspections are issued without individualized suspicion. This they cannot do because, although the ordinance does not *require* individualized suspicion, it does not *preclude* a district court from requiring that the City establish individualized suspicion before a warrant will issue. On the contrary, as the City points out, the ordinance expressly provides that "[n]othing in this Code shall limit or constrain the authority of the judicial officer to condition or limit the scope of the administrative warrant." Red Wing, Minn., City Code § 4.04, subd. 1(C)(9). The ref-

---

3. Black's Law Dictionary defines an "administrative warrant" as "[a] warrant issued by a judge at the request of an administrative agency ... sought to conduct an administrative search." *Black's Law Dictionary* 1722 (9th ed.2009). An "administrative search" is defined in turn as "[a] search of public or commercial premises carried out by a regulatory authority to enforce compliance with health, safety, or security regulations. The probable cause required for an administrative search is less stringent than that required for a search incident to a criminal investigation." *Id.* at 1468.

erence to the district court's authority to "condition . . . the administrative warrant" demonstrates that—regardless of whether the ordinance authorizes suspicionless searches—the court retains the power to require individualized suspicion in any given case. And if a court may require individualized suspicion in a particular case, then we cannot, applying appellants' constitutional standard, say that the ordinance is unconstitutional in all of its applications. *See McCaughtry I*, 808 N.W.2d at 339–40; *Minn. Voters Alliance*, 766 N.W.2d at 694–96.

Appellants argue that their facial challenge should not fail "simply because a judge might disregard the ordinance's text and impose requirements beyond those actually in the law." We disagree. Contrary to appellants' characterization, a district court that requires individualized suspicion would not be disregarding the text of the ordinance, but rather would be exercising its authority under the ordinance to "condition . . . the administrative warrant." In analyzing a facial challenge, we may "presume any narrowing construction or practice to which the law is 'fairly susceptible.'" *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (citation omitted); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). We do so because a facial challenge circumvents the opportunity for individual courts interpreting a law to apply "a limiting construction to avoid constitutional questions." *See Wash. State Grange*, 552 U.S. at 450, 128 S.Ct. 1184. In this case, the RDLC's text is susceptible to a limiting construction that allows district courts to require individualized suspicion in any given case.

In sum, we conclude that the RDLC's warrant mechanism for Licensing Inspections can be applied constitutionally, even under appellants' view of the law, because a district court may require individualized suspicion before issuing a warrant in a particular case. Because the law can be applied constitutionally, appellants' facial challenge fails and we must affirm the court of appeals. We need not decide the unsettled question of whether the Minnesota Constitution prohibits the issuance of an administrative warrant under the Red Wing Licensing Inspection ordinance absent some individualized suspicion of a housing code violation, and we express no opinion on whether appellants' argument could succeed on an as-applied basis.

Affirmed.

ANDERSON, PAUL H., Justice (concurring).

"I have got to say, that's a good no-call."

Phil Simms

CBS Sports Announcer

Super Bowl XLVII

February 3, 2013

I concur with the result reached by the court. When subjected to a facial challenge under Minnesota's Constitution, the City of Red Wing's rental inspection and licensing ordinance passes constitutional muster, but only by the skin of its teeth. What our court does today is make a "good no-call" on a close issue of constitutional law. This is the way it should be when we are rendering a decision on whether a legislative act is repugnant to our constitution.

The majority does an excellent job of explaining the reasons behind our traditional reluctance to declare a legislative act unconstitutional. This reluctance is especially appropriate when we are considering whether, on its face, a legislative act like the Licensing Inspections provision in the Rental Dwelling Licensing Code (RDLC)

violates article I, section 10, of the Minnesota Constitution. Article I, section 10, prohibits unreasonable searches and seizures. Facial challenges like the one before us today are disfavored because they often rest on speculation, and thus require a showing that, when applied, the legislative or executive act being questioned will "'always operate[ ] unconstitutionally.'" *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 339 (Minn.2011) (quoting *Black's Law Dictionary* 261 (9th ed.2009)) (emphasis omitted). Operating within constitutional restraints grounded in the concept of the separation of powers, we must approach a constitutional challenge to the exercise of powers by one of the other two branches of government with restraint and with "much delicacy." *See Fletcher v. Peck*, 10 U.S. 87, 6 Cranch 87, 128, 3 L.Ed. 162 (1810). We must "seldom, if ever ... in a doubtful case" hold that another branch of government has "transcended its powers" such that its acts are "to be considered as void." *Id.*

Chief Justice John Marshall, the fourth Chief Justice of the United States Supreme Court, articulated this fundamental principle of constitutional law and judicial review more than two centuries ago when he said:

> The question, whether a law be void for its repugnancy to the constitution, is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge

feels a clear and strong conviction of their incompatibility with each other.

*Id.* Under this long-standing and firmly-established precedent, we are to exercise restraint when reviewing a legislative act to determine whether that act is repugnant to the constitution. Applying Chief Justice Marshall's precedent from more than two centuries ago, I believe that our court has acted properly in deciding the case before us today.

Notwithstanding my agreement with the result reached by the court, my concern regarding the validity of the City's ordinance as applied to the citizens of Red Wing is the reason I write separately. The City's ordinance survives a facial challenge because it contains a provision that, when a citizen of Red Wing withholds consent to an inspection under the ordinance, the City must seek permission "from a judicial officer through an administrative warrant" before the City can proceed with an inspection. Red Wing, Minn., City Code § 4.04, subd. 1(C)(9) (2012). Even though the ordinance does not require individualized suspicion before the City can make an inspection, there is nothing in the ordinance that prohibits a judicial officer—the district court—from requiring that the City establish this level of suspicion before a warrant is issued. Therefore, because a judicial officer may require individualized suspicion, I am able to agree that the ordinance is not unconstitutional in *all* of its applications and, thus, it survives this facial challenge.

But I also conclude that the city officials and judicial officers charged with providing oversight of the City's use of administrative warrants must proceed in a diligent and exacting manner in order to avoid violating the rights of Red Wing's citizens under both the federal and state constitutions. If the city officials and judicial offi-

cers do not proceed properly, the City runs a substantial risk of having its ordinance invalidated in an as-applied challenge.

My conclusion as to the vulnerability of the ordinance to an as-applied challenge is bolstered by the fact that, to date, the Goodhue County District Court has on three occasions rejected requests by the City for the issuance of an administrative warrant. On the one hand, this result is heartening because judicial oversight of the application of the City's ordinance is not only required by the ordinance but is necessary for the ordinance to pass constitutional muster. Judicial oversight is critical because I conclude that the Minnesota Constitution prohibits the issuance of an administrative warrant to conduct a housing inspection unless there has been some showing of individualized suspicion of a housing code violation.

On the other hand, the oversight process employed thus far is disheartening because the district court denied the City's administrative warrant applications by finding the requested warrants unreasonable under *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). This result is disheartening for two reasons. First, *Camara* is not the appropriate standard to apply because the Minnesota Constitution mandates a higher standard than the federal constitution as interpreted in *Camara* for allowing an inspection of an individual's private residence. I do not believe that the standard

articulated in *Camara* is sufficient in light of how we have applied the Minnesota Constitution. *Camara* attempts to define a difference between administrative warrants and a standard search warrant. *Id.* at 535–39, 87 S.Ct. 1727. The distinction articulated by the Court in *Camara* falls short of the rights guaranteed to Minnesotans by their constitution. Further, the level of suspicion in *Camara* is so imprecise that the Court essentially leaves it up to the City to decide the reasonableness of its own conduct. We have previously found a similar approach to be constitutionally deficient, meaning that such a standard is definitely a departure from what we require in Minnesota. *See Ascher v. Comm'r of Pub. Safety*, 519 N.W.2d 183, 186–87 (Minn.1994).

Second, the fact that the district court has on three occasions rejected the City's request for an administrative warrant, even when the district court was employing a standard with a threshold lower than what the Minnesota Constitution requires, provides some hint as to the minimal legal threshold the City believes it must cross before invading a citizen's home.[1] Moreover, whatever proof has thus far been required, there is a real risk that such proof may not be uniformly required by a "judicial officer" in future instances.

On several occasions we have said that, in order to adequately protect the right of Minnesota citizens to be free from unreasonable searches and seizures, we are willing to look beyond the United States Su-

---

**1.** The City's argument in its brief and at oral argument did little to assuage my concerns about how the City plans to enforce its ordinances. As appellants pointed out, the City may well have overstated the extent of its housing problem and how difficult it is to detect problems. In addition, the scope of the inspections allowed under the ordinance is ill-defined, as are the limitations on both the nature of the search and how the informa-

tion from it is shared. There is only the language in the Code itself wherein there are no apparent policies on what and when information may be shared—or even under what circumstances an inspector can open cabinets and closets. Further, the extent to which law enforcement may gain access on the City's intranet to information from or relating to a search is also not clearly defined.

preme Court's interpretation of the United States Constitution and look to article 1, section 10, of the Minnesota Constitution. The Minnesota Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

Minn. Const. art. I, § 10. Despite language that we have said is "textually identical" to the Fourth Amendment, *State v. Wiegand,* 645 N.W.2d 125, 132 (Minn. 2002); *see also State v. Harris,* 590 N.W.2d 90, 97 (Minn.1999), we have, when necessary, construed article I, section 10, to provide greater protection than the federal constitution, *see State v. Carter,* 697 N.W.2d 199, 210 (Minn.2005); *Ascher,* 519 N.W.2d at 187. But we have been careful when we have done so.

"We adhere to the general principle of favoring uniformity with the federal constitution," and will "not independently apply our state constitution absent language, concerns, and traditions unique to Minnesota." *Kahn v. Griffin,* 701 N.W.2d 815, 824–25 (Minn.2005). But we have also stated that the Supreme Court's interpretation of a textually identical federal provision "is of inherently persuasive, although not necessarily compelling, force." *Id.* at 826 (citation omitted). Thus, we will not reject the Court's interpretation "merely because we want to bring about a different result," *id.* at 824, nor will we depart based "on some slight implication and vague conjecture," *id.* at 828.[2]

Under the Minnesota Constitution, a legislative act like the City's ordinance cannot be used as an unfettered vehicle for the City to inspect a citizen's home. A citizen's private residence is the place where that citizen's privacy interest is most heightened and our constitutional protections are at their greatest. *See, e.g., State v. Carothers,* 594 N.W.2d 897, 900 (Minn.1999) ("Minnesota has long adhered to the common law recognition of the home's importance. . . ."); *accord Payton v. New York,* 445 U.S. 573, 587, 596–97, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment," and "the freedom of one's house was one of the most vital elements of English liberty") (citations omitted) (internal quotation marks omitted). We have explicitly acknowledged the historical roots of these rights when we said that "a man's home is his castle." *State v. Casino Mktg. Grp., Inc.,* 491 N.W.2d 882, 888 (Minn. 1992) (citation omitted) (internal quotation marks omitted). Further, it is axiomatic that Minnesota law requires searches to be supported by individualized suspicion. *See State v. Henning,* 666 N.W.2d 379, 385 (Minn.2003) (noting the "general requirement of individualized suspicion").

Minnesota has a proud tradition of applying its constitution more broadly than the United States Constitution when acting to protect the privacy interests of its citizens. We do so by requiring a high standard before the government can conduct warrantless searches. In the context

---

2. But we have also explicitly described the criteria we will use when we apply the Minnesota Constitution beyond the scope of the federal constitution. *See Rickert v. State,* 795 N.W.2d 236, 247 (Minn.2011) (outlining criteria); *see generally* Paul H. Anderson & Julie A. Oseid, *A Decision Tree Takes Root in the Land of 10,000 Lakes: Minnesota's Approach to Protecting Individual Rights Under Both the United States and Minnesota Constitutions,* 70 Alb. L.Rev. 865 (2007).

of the case before us, this tradition can best be defined by three of our leading cases: *Ascher*, 519 N.W.2d 183; *State v. Larsen*, 650 N.W.2d 144 (Minn.2002); and *Carter*, 697 N.W.2d 199.

*Ascher* involved the use of a temporary roadblock to stop cars to investigate for drunk driving. 519 N.W.2d at 184. Although the roadblock procedure used by the police was challenged under both the federal and state constitutions, the federal claim was foreclosed by the Supreme Court's decision in *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). We declined to follow *Sitz* and instead looked to the Minnesota Constitution for guidance. Although we did not disagree with the Supreme Court's balancing test in *Sitz*, we took issue with the Court's " 'radical' departure from the way the test has been and should be applied, with the result that for Fourth Amendment purposes police, in effect, are allowed to decide the reasonableness of their own conduct." *Ascher*, 519 N.W.2d at 186 (footnote omitted). We also questioned the Court's apparent conclusion that "as long as stops are not discriminatory—that is, as long as everyone is stopped—stops need not be based on individualized suspicion." *Id.* Based primarily on the State's failure to show that there was individualized suspicion, we held that the use of such roadblocks "violates Minn. Const. art. I, § 10, which we have long held generally requires the police to have an *objective individualized articulable suspicion* of criminal wrongdoing *before* subjecting a driver to an investigative stop." *Id.* at 187 (first emphasis added).

In *Larsen*, we held that a conservation officer's warrantless and suspicionless entry into an ice-fishing house was unreasonable under both the federal and state constitutions. 650 N.W.2d at 153–54. As in *Ascher*, we balanced privacy interests against the gravity of public concerns and the extent to which the police conduct advanced the public interest. *Id.* at 148–49. We emphasized the privacy interest in an ice-fishing house, noting its similarity to a home. We concluded that this privacy interest was "at least as great as that of the motor vehicle occupants in *Ascher*." *Id.* at 150. Although we acknowledged that the State "clearly has a strong interest in regulating and protecting its wildlife," that interest was "surely no greater" than the interest in protecting human lives by deterring drunk driving in *Ascher*, and could not outweigh an individual's privacy interest in the ice-fishing house. *Id.* at 150, 153. Accordingly, we held that the constitutional balance weighed in favor of the individual, and a conservation officer's warrantless entry was thus "per se unreasonable" under both the state and federal constitutions. *Id.* at 154.

Finally, in *Carter*, we considered whether the police's use of a drug-detection dog outside of a fenced self-storage unit violated either the federal or state constitutions. 697 N.W.2d at 202. We concluded that a warrantless dog sniff outside of a storage unit does not require any suspicion to justify it under the federal constitution. *Id.* at 209. But we then concluded that a person's expectation of privacy in a storage unit is greater under the Minnesota Constitution than it is under the federal constitution. *Id.* at 210–11. We relied on the fact that the storage unit was comparable to a garage, was a fixed location used to store personal effects, and was large enough to contain numerous possessions and even to conduct some personal activities. *Id.* at 210–11. We held that we must apply the standard of reasonable articulable suspicion in order to strike the proper balance between the privacy interests and the public interest in effective criminal investigations. *Id.* at 211–12.

Given that the home is universally considered to be the most private and protected space for citizens, these are important constitutional principles that we can and must take away from our case law that relate to the sanctity of the home. Indeed, our court has been willing to extend protections under the Minnesota Constitution that are stronger than those in the United States. Constitution even in situations outside of the home, where citizens' privacy interests are less heightened—including traffic stops (*Ascher*), dog sniff searches of a storage unit (*Carter*), and an ice-fishing house (*Larsen*). While nothing in our case law suggests that the right to privacy in the home is absolute or that the level of reasonable suspicion or official governmental justification required by the constitution is inflexible, our case law does indicate that it is a right that we must treat with great respect—even reverence. Our cases also reflect the principle that the overarching requirement of the Minnesota Constitution, like the federal constitution, is reasonableness. *See State v. Davis*, 732 N.W.2d 173, 178 (Minn.2007). We do not apply "a mechanical interpretation" of the constitution, and "what constitutes an unreasonable search must be assessed based on the facts of each particular case." *Id.*

When and if our court is faced with making a determination as to the ultimate constitutionality of the City's inspection ordinance as applied, we will proceed under the overarching principle of reasonableness but also in light of our prior cases that demonstrate the broad constitutional protections Minnesotans have under their constitution. There will also understandably be additional fact issues facing us and we will need to consider those *facts if and when they arise* and are presented to us. Nevertheless, our prior case law and the broader protections provided by the Minnesota Constitution lead me to conclude, at least at this point, that some level of individualized suspicion will be required before the administrative warrants are issued. If individualized suspicion is not required, the warrants may violate a citizen's rights under the Minnesota Constitution. If the City of Red Wing continues to pursue, or in the future judicial officers grant, administrative warrants under the ordinance without some reasonable individualized suspicion, then an as-applied challenge to the ordinance should succeed.

A final observation is in order before I end this concurrence. There are several commentators who describe the role of the judiciary in our separation of powers system of government as being similar to the role of an umpire calling balls and strikes or a referee calling fouls. *See* Thomas B. Colby, *In Defense of Judicial Empathy*, 96 Minn. L.Rev.1944, 1947 & n. 7 (2012) (citing *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 55 (2005)). I always wince a bit when I hear this description because I do not believe that it provides an accurate description of the judiciary's role as a co-equal branch of government. That said, the place where the foregoing description comes closest to being an apt metaphor is when courts like ours interpret and apply the constitution to the acts of the other two branches of government. Issues like the one we address today are among the most important types of issues we address as a supreme court—the constitutional validity of an act done by one of the other two branches of government.

As a court of last resort we are frequently asked to determine if one branch of government has trespassed on the territory of the other, *see, e.g., Brayton v. Pawlenty*, 781 N.W.2d 357 (Minn.2010) (considering constitutionality of unallotment by the Governor), or whether anoth-

er branch has exceeded the limited powers granted to it by the people in the constitution—for instance in *Ascher*, 519 N.W.2d 183, *Carter*, 697 N.W.2d 199, and *Larsen*, 650 N.W.2d 144. As previously noted, when deciding such cases, the judiciary must exercise its power with restraint and with "much delicacy." *Fletcher*, 6 Cranch at 87. The issue in these cases most often comes down to what is too much restraint and what is too little.

Like a referee who calls a game too closely—calls too many fouls—if courts too readily hold the act of another branch of government to violate the constitution, judicial decisions can disrupt the nature, substance, and the end result of the delicately balanced decision-making process in our democracy. On the other hand, if courts are too lax or benign—call the game too loosely—the democratic process, much like an athletic game, can become excessively physical, uncalled fouls will occur, and people will get hurt.[3] If the Supreme Court or our court is unmindful of its solemn obligation to hold as void a law that is repugnant to the constitution, it will have failed in its duty "to guard the Constitution and the rights of individuals from the effects of ill humors" that sometimes arise in our democratic society. The Federalist No. 78 (Alexander Hamilton).

While decisions like the one we make today rank among the most important and difficult decisions we make, we do have some helpful guidelines for making them. Chief Justice John Marshall gave us such guidance when he said: "The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher*, 10 U.S. at 128. Here, even though I have significant concerns as to how the City's ordinance will ultimately be applied to the citizens of Red Wing, I agree with the result reached by the majority. When examining this facial challenge to the City's ordinance, I am not left with a clear and strong conviction that the ordinance is incompatible with the Minnesota Constitution *in all of its applications*. Therefore, even though there are significant problems with the City's ordinance, "I have got to say, that's a good no-call"[4] we are making today.

3. *See e.g. Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (invalidating restrictions on political expenditures by corporations and labor unions on the ground that such restrictions violate the First Amendment); *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (invalidating a New York regulation limiting the hours of laborers in bakeries to ten hours per day or sixty hours per week by utilizing the theories of social Darwinism and laissez-faire economics to formulate policy rather than interpret the law).

4. During Super Bowl XLVII, CBS sports announcer and former NFL quarterback Phil Simms exclaimed, "I have got to say, that's a good no-call" after the referees made a controversial "no-call" during the final two minutes of the game. With the Baltimore Ravens leading the San Francisco 49ers, Ravens' cornerback Jimmy Smith and 49ers' wide receiver Michael Crabtree came into physical contact in the Ravens' end zone during a fourth-down play that started at the Ravens' five yard line. If Smith committed a foul during the play, the 49ers would maintain possession of the ball and would have four more downs to try to score. Many observers claim that when Smith put his hands on Crabtree he committed pass interference, while others claim that there was as much or more physical contact initiated by Crabtree and that, regardless of the physical contact, the pass was not catchable. In any case, on this key play, with the result of the game hanging in the balance, the referees did not call a penalty, the pass was ruled incomplete, the 49ers'

drive ended, and the Ravens won Super Bowl XLVII. The play and the referees' controversial "no-call" illustrate how the approach taken by a referee, or a court, in deciding whether to call a foul on a close play at a critical time, or whether to make a "no-call" can have a dramatic impact on the tone and outcome of a game—or how the law is construed and applied in our democratic society.