In re the Application for an Administrative Search Warrant, CITY OF GOLDEN VALLEY, Respondent,

v.

Jason WIEBESICK, Appellant,

Jacki Wiebesick, Appellant,

Jessie Treseler, Appellant,

Tiffani Simons, Appellant.

A15-1795

Supreme Court of Minnesota.

Filed: July 19, 2017

---

Court of Appeals

Ashleigh M. Leitch, Allen D. Barnard, Thomas G. Garry, Best & Flanagan LLP, Minneapolis, Minnesota, for respondent.

Anthony B. Sanders, Meagan A. Forbes, Lee U. McGrath, Institute for Justice, Minneapolis, Minnesota, for appellants.

Teresa Nelson, Saint Paul, Minnesota, for amicus curiae American Civil Liberties Union of Minnesota.

Bennett Evan Cooper, Steptoe & Johnson LLP, Phoenix, Arizona; William K. Forbes, Bolt Hoffer Boyd Law Firm, Anoka, Minnesota; and Kimberly Reynolds Crockett, Center of the American Experiment, Golden Valley, Minnesota, for amici curiae Center of the American Experiment, Cato Institute, and Electronic Frontier Foundation.

Mahesha P. Subbaraman, Subbaraman PLLC, Minneapolis, Minnesota, for amicus curiae Freedom Foundation of Minnesota.

Jessica Mikkelson, Minneapolis, Minnesota, for amicus curiae HOME Line.

John T. Sullivan, Angela M. Porter, Dorsey & Whitney LLP, Minneapolis, Minnesota, for amicus curiae InquilinXs UnidXs por Justicia.

Susan L. Naughton, Saint Paul, Minnesota, for amicus curiae League of Minnesota Cities.

## OPINION

LILLEHAUG, Justice.

For at least half a century, federal constitutional law has been clear: an administrative search warrant need not be supported by individualized suspicion of a code violation to justify an unconsented-to rental housing inspection. *Camara v. Mun. Court,* 387 U.S. 523, 538, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Such an administrative warrant satisfies the probable cause requirement in the Fourth Amendment to the United States Constitution "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* Appellants invite us to be the first state supreme court to depart from the United States Supreme Court's decision in *Ca-*

*mara* and hold that Minnesota's constitution requires more: probable cause of the sort required in a criminal investigation. We decline their invitation and affirm the court of appeals. But we make clear that, to protect tenants' privacy interests, administrative search warrant procedures must include notice, an opportunity to be heard, and judicial consideration of reasonable restrictions on the inspection.

## FACTS

The City of Golden Valley has a housing code that establishes minimum standards for rental housing and requires licenses for all residential rental properties. Golden Valley, Minn., City Code § 6.29, subds. 1, 4(A) (2015). The purpose of the code is to "safeguard life, limb, health, property and public welfare." *Id.*, subd. 1. Under the City's current policy, the City inspects rental properties for compliance with the city housing code once every 3 years. *Cf. id.*, subd. 4(E) (2015) ("The Code Official shall determine the schedule of periodic inspections."). As a condition for a rental license, the landlord agrees to permit inspections after "reasonable notice from the Code Official" to the landlord to "determine compliance with the City Code and state law." *Id.*, subd. 4(F) (2015). The city housing code also requires that the tenant grant access to the rental unit "at reasonable times" and "for the purpose of effecting inspection, maintenance, repairs or alterations" that are necessary to comply with the code. *Id.* The code states that inspections "include all common areas, utility and mechanical rooms, garages," and the exterior of the property. *Id.*, subd. 4(E).

Appellants Jason and Jacki Wiebesick (landlords) own a duplex in Golden Valley. The landlords resided in half of the dwelling, and appellants Tiffani Simons and Jessie Treseler (tenants) rented the other half

at all times relevant to this appeal. In April 2015, the landlords applied to renew their rental license. The City granted the renewal and sent a letter to the landlords instructing them to call the City to schedule the triennial inspection as a requirement for maintaining their license. The City's letter informed the landlords that they must give the tenants at least 24 hours' notice of the inspection, and that the landlords or a representative were required to be on site during the inspection.

The landlords and the tenants sent a letter to the City in response, stating that they would not consent to an inspection on the ground that a search without a warrant based on individualized suspicion violates the United States Constitution and the Minnesota Constitution. The City, in return, petitioned the district court for an administrative search warrant to inspect the property for compliance with the code. *See* City Code § 6.29, subd. 4(F) ("If any Owner . . . or Tenant fails or refuses to permit entry to a Rental Dwelling under its control for an inspection pursuant to this Section, the Code Official may pursue any remedy at law or under the City Code, including, but not limited to, securing an administrative search warrant for the Rental Dwelling . . . ."). In its petition, the City noted that the purpose of the inspection was to determine compliance with the city housing code and to evaluate whether the rental unit conformed to "minimum mechanical and interior standards" for rental dwellings, "including but not limited to standards for: structural integrity; ventilation requirements for bathrooms and clothes dryers; size of bedrooms; adequate and properly installed kitchen sinks; proper installation, pressure, and temperature for water heating facilities; fireplaces; cooking appliances; lighting and electrical systems; and smoke detectors."

The district court scheduled a hearing on the City's petition. The landlords and the tenants were served with the City's petition and received notice of the hearing, but they did not attend or submit anything in writing. At the hearing, the district court inferred that the landlords and the tenants opposed any warrant issued without individualized suspicion of a code violation in the rental unit. The City acknowledged that it had no such individualized suspicion. The district court denied the petition for the administrative search warrant, reading our precedent to "foreclose issuance of a search warrant" without suspicion of a code violation.

■ The court of appeals reversed. Noting that our precedent did not resolve the issue, the court held that the Minnesota Constitution does not require individualized suspicion of a code violation to support an administrative search warrant for a rental housing inspection. *City of Golden Valley v. Wiebesick*, 881 N.W.2d 143, 145-46, 148 (Minn.App. 2016). We granted the landlords' and the tenants' petition for review.[1]

## ANALYSIS

■ The primary issue on appeal is whether Article I, Section 10 of the Minnesota Constitution requires probable cause of the sort needed in a criminal investigation for a warrant to inspect a rental unit for housing code violations. This question is one of constitutional interpretation, which we review de novo. *State v. Brooks*, 604 N.W.2d 345, 348 (Minn. 2000).[2]

■ The Fourth Amendment does not require a city to show individualized suspicion to obtain an administrative warrant for a routine rental housing inspection. *Camara*, 387 U.S. at 538, 87 S.Ct. 1727. *Camara* emphasized that, unlike criminal search warrants, probable cause for administrative warrants does not depend on specific knowledge of the conditions of the particular rental property to be inspected. *Id.* Instead, *Camara* authorized administrative search warrants to conduct housing inspections as long as "reasonable legislative or administrative standards for conducting an area inspection are satisfied." *Id.* These standards may be based on "the nature of the building," "the condition of the [ ] area," or "the passage of time." *Id.*

1. Although this appeal was filed by both the landlords and the tenants, at oral argument counsel for both sides acknowledged that only the tenants' privacy rights are at issue in this case. The landlords' concession was apt, because landlords have a lesser expectation of privacy in rental units than the tenants who occupy them. *See State v. Licari*, 659 N.W.2d 243, 251 (Minn. 2003) (stating that while a landlord might reserve "rights of access," he or she typically does not have "rights of use").

For example, a landlord does not have the authority to consent to a police search of a rental unit occupied by a tenant, even when the landlord explicitly reserves "the right to enter the premises at any reasonable time." *Id.* (quoting *State v. Hodges*, 287 N.W.2d 413, 414 (Minn. 1979)) (internal quotation marks omitted); *see Chapman v. United States*, 365 U.S. 610, 617-18, 81 S.Ct. 776, 5 L.Ed.2d 828

(1961) (holding that a warrantless search of a rental unit was unlawful even where the landlord gave consent). Further, landlords typically cannot assert privacy rights on behalf of tenants. *See, e.g., Rozman v. City of Columbia Heights*, 268 F.3d 588, 591 (8th Cir. 2001) (en banc) (holding that a landlord did not have standing to assert his tenants' Fourth Amendment rights), *cert. denied*, 535 U.S. 971, 122 S.Ct. 1438, 152 L.Ed.2d 382 (2002).

2. Appellants argue that, as part of the standard of review, *Ascher v. Commissioner of Public Safety*, 519 N.W.2d 183, 186 (Minn. 1994), imposes a burden of proof on the City to show that individualized suspicion is (1) impractical, and (2) outweighs the intrusion into the privacy of ordinary citizens for whom there is no reason to suspect wrongdoing. But *Ascher* provides a statement of substantive law, not a standard of review.

■ *Camara* is not dispositive here because we may interpret the Minnesota Constitution to provide greater protection to individuals than the United States Constitution. We are "independently responsible for safeguarding the rights of [Minnesota's] citizens." *State v. Fuller*, 374 N.W.2d 722, 726 (Minn. 1985) (citation omitted) (internal quotation marks omitted). The district court concluded that we had done just that in *McCaughtry v. City of Red Wing*, 831 N.W.2d 518 (Minn. 2013), and read that decision to require individualized suspicion for administrative search warrants. The district court was not correct. In *McCaughtry*, we only assumed *arguendo* that individualized suspicion was required for an administrative search warrant under Article I, Section 10. *Id.* at 525. We concluded that we *"need not decide the unsettled question* of whether the Minnesota Constitution prohibits the issuance of an administrative warrant under the Red Wing Licensing Inspection ordinance absent some individualized suspicion of a housing code violation." *Id.* (emphasis added). We decide that question now.

## I.

■ To analyze whether the Minnesota Constitution requires greater protection than the United States Constitution, we will employ the analytical framework set out in *Kahn v. Griffin*, 701 N.W.2d 815, 828 (Minn. 2005), because both parties rely on it to structure their arguments.[3] We will not "cavalierly construe [the] state constitution more expansively" than the United States Constitution, *id.* at 825 (citation omitted) (internal quotation marks omitted), nor will we reject a United States Supreme Court interpretation of the United States Constitution "merely be-

cause we want to bring about a different result," *id.* at 824. We favor uniformity with the federal constitution because of the "primacy of the federal constitution in matters affecting individual liberties" and to encourage consistency in constitutional law in state and federal courts. *Id.*

■ But we will depart from federal precedent when we have a "clear and strong conviction that there is a principled basis" to do so. *Kahn*, 701 N.W.2d at 828. Generally, we apply the state constitution "independently" when we discern "language, concerns, and traditions unique to Minnesota." *Id.* at 825. In all cases, we employ our independent judgment in interpreting the Minnesota Constitution. *Id.* at 828.

■ We begin by looking to the text of the Minnesota Constitution. We take a "more restrained approach when both constitutions use identical or substantially similar language." *Id.* Despite our restraint, we will interpret the Minnesota Constitution "independently" when (1) "the United States Supreme Court has made a sharp or radical departure from its previous decisions or approach to the law and when we discern no persuasive reason to follow such a departure"; (2) the United States Supreme Court has "retrenched on Bill of Rights issues"; or (3) federal precedent "does not adequately protect our citizens' basic rights and liberties." *State v. McMurray*, 860 N.W.2d 686, 690 (Minn. 2015) (quoting *Rew v. Bergstrom*, 845 N.W.2d 764, 795 (Minn. 2014)) (internal quotation marks omitted).

The parties agree that the two constitutional provisions are substantially similar. Nevertheless, appellants argue that the Minnesota Constitution should be read

---

**3.** We agree with the dissent that *Kahn* does not limit our ability to analyze our constitution independently based on its text, structure, and history. We also note that neither party advocated for the abandonment of the *Kahn* framework; rather, both relied on *Kahn*.

more expansively than the United States Constitution to require individualized suspicion for administrative search warrants. Appellants contend that *Camara* is a sharp departure, that the case retrenched on a Bill of Rights issue, and that *Camara*-type administrative search warrants do not adequately protect Minnesotans. The City disagrees on all counts. We discuss each of the factors argued in turn.

### A.

As a threshold matter, we reaffirm that the Fourth Amendment to the United States Constitution[4] is "textually identical" in all relevant respects to Article I, Section 10 of the Minnesota Constitution.[5] *State v. Carter*, 697 N.W.2d 199, 209 (Minn. 2005). We therefore take a "restrained" approach when determining whether the Minnesota Constitution provides different guarantees than the United States Constitution. *Kahn*, 701 N.W.2d at 828.

The dissent and amicus curiae Freedom Foundation of Minnesota (FFM), on the other hand, contend that the two constitutional provisions are different. They rely on the fact that Article I, Section 10 uses a *semicolon* between the first clause, the reasonableness clause, and the second clause, the warrant clause, whereas the Fourth Amendment uses a *comma*. The dissent and FFM argue that this semicolon in Article I, Section 10 creates two independent clauses. As a result, they argue, *Camara* cannot be followed under the Minnesota Constitution because *Camara* blends considerations of reasonableness into its analysis of the warrant clause, while Article I, Section 10 requires that those considerations be separate.

Appellants did not raise this issue in their brief. In fact, appellants agreed that the text of the two provisions is "virtually identical." We generally do not reach issues raised only by nonparty amicus curiae. *State v. Smith*, 876 N.W.2d 310, 327 n.5 (Minn. 2016). Nevertheless, because the dissent relies so heavily on it, we will address this argument and put it to rest. It fails for three reasons.

First, the semicolon on which the dissent and FFM rely is nothing but an historical accident. In the original version of the Minnesota Constitution, adopted in 1857, Article I, Section 10 tracked the Fourth Amendment exactly: a comma separated the two clauses.[6] Minn. Const. of 1857, art. I, § 10; Francis H. Smith, *The Debates and Proceedings of the Minnesota Constitutional Convention Including the Organic Act of the Territory* 652 (Democratic ed. 1857). Plainly, the drafters of the Minnesota Constitution intended the federal and state provisions to be identical. *See* T.F. Andrews, *Debates and Proceedings of the Constitutional Convention for the Territory of Minnesota* 105 (Republican ed. 1858) (2009) (quoting a framer of the Minnesota

---

4. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

5. "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized." Minn. Const. art. I, § 10.

6. Oddly, in the 1858 volume of the Public Statutes of the State of Minnesota, the Fourth Amendment of the United States Constitution was printed incorrectly, with a semicolon separating the two clauses.

Constitution, who stated that the language used in the search-and-seizure provision of the Minnesota Constitution "is the same" as that in the United States Constitution, and that "it seems to me to be sufficient").

From 1858 until 1894, the Minnesota Constitution was printed in the Minnesota General Statutes in the same way, with a comma separating the two clauses. In the next printing of the laws in 1905, published in the Minnesota Revised Laws, the comma was replaced with a semicolon.[7] Neither the Legislature nor the voters approved this change. The reason for the switch from the comma to a semicolon is unknown, and we have found none. Perhaps it was a printer's error.

No matter, says the dissent, because the semicolon was somehow "reaffirmed" in 1974 when voters approved revisions to the Minnesota Constitution. But the voters were not informed that the semicolon was not in the original version of the constitution. Act of Apr. 10, 1974, ch. 409, 1974 Minn. Laws 787, 787-820 (containing the text of the measure reforming the Minnesota Constitution that was ultimately adopted by the voters). The voters cannot be said to have "reaffirmed" a typographical error. To say otherwise would contradict the official representation made to the voters that the 1974 changes were meant to "improve [the constitution's] clarity ... without making any consequential changes in its legal effect[.]" *Id.* § 3, 1974 Minn. Laws at 819-20 (containing the text of the question presented to the voters). The dissent's conclusion also conflicts with our reasoning in *Butler Taconite v. Roemer*, where we noted that even the removal of a phrase in the 1974 restructuring of the Minnesota Constitution "was not intended to change the interpretation of the section ... only to make the Constitution more readable and stylistically correct." 282 N.W.2d 867, 868 n.1 (1979) (discussing the removal of the phrase "and payable" from a constitutional provision).

Second, even if we were to deem our constitution to have been amended in error, the dissent's textual argument fails because—comma or semicolon—the two clauses are connected by the conjunction "and." That word indicates that the two clauses should be read together. *See The American Heritage Dictionary of the English Language* 66 (5th ed. 2011) (defining "and" as "[t]ogether with or along with"). As a result, the semicolon does not deliver the powerful impact the dissent imagines.[8]

---

7. Interestingly, in the 1905 printing of the Minnesota Revised Laws, the mistaken semicolon in the Fourth Amendment as printed in the Public Statutes had been corrected to a comma.

8. The dissent contends that the semicolon must mean something because a number of other states use semicolons, or even periods, to separate the warrant clause from the reasonableness clause. But a number of those states have concluded generally that their provisions are substantially similar to the Fourth Amendment. *See Holbrook v. Knopf*, 847 S.W.2d 52, 55 (Ky. 1992) (concluding there is "no significant difference" between the state and federal constitutions and there are "no substantial reasons calling for a different result"); *People v. Collins*, 438 Mich. 8, 475 N.W.2d 684, 691 (1991) (concluding that the state constitution should be construed to provide the same protection as the Fourth Amendment, absent a "compelling reason" otherwise); *State v. Lloyd*, 129 Nev. ——, 312 P.3d 467, 473 (Nev. 2013) (stating that the state and federal constitution "use virtually identical language" and so "independently deriving a different formulation to protect the same liberty that the United States Constitution secures ... cannot be justified"); *Gomez v. State*, 168 P.3d 1139, 1142 n.4 (Okla. Crim. App. 2007) (noting that the Oklahoma Constitution is "nearly identical" to the Fourth Amendment). As for Iowa, and unlike Minnesota, the semicolon found in that state's constitution was included in the original version of the constitution in 1857. *See* Iowa Const. of 1857, art. I, § 8.

Third, we cannot imagine that either the framers of our constitution or the voters in 1974 would intend the consequence of the dissent's interpretation. By its reasoning, a warrant supported by individualized suspicion would be required for most routine, unconsented-to administrative inspections focused on preventing contamination, abuse, injuries, disease, and disaster. This would endanger public health and safety. As the Legislature has recognized, routine inspections are necessary for many facilities throughout our state, including hospitals, Minn. Stat. § 144.55, subd. 4 (2016); nursing homes, Minn. Stat. § 144A.10, subd. 2 (2016); licensed child care and elder care facilities, Minn. Stat. § 245A.09, subd. 7(e) (2016); commercial feed sites, Minn. Stat. § 25.41 (2016); agricultural chemical sites, Minn. Stat. § 18D.201 (2016); workplaces subject to Minnesota's Occupational Safety and Health Act, Minn. Stat. § 182.659 (2016); solid waste facilities, Minn. Stat. § 400.06 (2016); facilities with radioactive or nuclear material, Minn. Stat. § 144.1205, subd. 7 (2016); and entities that process food, such as dairies, Minn. Stat. § 32.103 (2016), egg handlers, Minn. Stat. § 29.22 (2016), and aquatic farms, Minn. Stat. § 17.4991, subd. 3 (2016). The dissent's reading would render most such routine inspections, in the absence of consent or exigent circumstances, unconstitutional.[9]

Accordingly, we will not make new constitutional law based on, at best, a typographical error. To do so would amount to textualism run amok. We have repeatedly stated, and we state again, that the Fourth Amendment and Article I, Section 10 are in all relevant respects "textually identical." *McMurray*, 860 N.W.2d at 689 n.1 (quoting *Carter*, 697 N.W.2d at 209) (internal quotation marks omitted).

## B.

We next consider whether the United States Supreme Court's decision in *Camara* marked a sharp or radical departure from Fourth Amendment precedent. Appellants argue that the previous understanding of the Fourth Amendment required all warrants to be based on probable cause with individualized suspicion. The City, on the other hand, argues that *Camara* was not a departure.

The Supreme Court first considered the Fourth Amendment implications of routine housing-code inspections in *Frank v. Maryland*, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959). *Frank* held that no warrant was required under the Fourth Amendment to conduct a housing inspection. *Id.* at 373, 79 S.Ct. 804. *Camara* overruled *Frank*, holding that routine housing-code inspections were "significant intrusions" on Fourth Amendment inter-

---

**9.** Contrary to the dissent's characterization, our primary concern here is not with the result of the case but with the intent of the framers of the Minnesota Constitution. Routine administrative inspections would have been considered constitutional in the early years of our statehood. In the nineteenth century, the Legislature enacted a number of such laws authorizing routine inspections. *See* Minn. Gen. Stat. ch. 24, § 2258 (1894) (establishing administrative inspections of factories for the protection of employees); Minn. Gen. Stat. ch. 101, §§ 7024, 7048 (1894) (authorizing inspections of all places where dairy products are made, stored, or served, and requir-

ing yearly sanitary inspections of towns by the town supervisor and a physician). And the Legislature continued enacting laws that required administrative inspections even after the semicolon somehow appeared in the 1905 printing of the Minnesota Revised Laws. *See* Minn. Rev. Laws § 2374-4 (Supp. 1909) (requiring yearly inspections against fire for inns, hotels, and lodging houses); Minn. Rev. Laws § 1824-9 (Supp. 1909) (requiring routine inspections of mines for employee safety); Minn. Rev. Laws § 1771-9 (Supp. 1909) (establishing routine inspections of canneries where fruits or vegetables are preserved).

ests that require an administrative search warrant. 387 U.S. at 534, 87 S.Ct. 1727.

The Court then considered what type of "probable cause" was required to support such a warrant. *Id.* Prior to *Camara* and *Frank*, the Court had developed the concept of probable cause largely in the criminal context, requiring that "the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed," *Dumbra v. United States*, 268 U.S. 435, 439, 45 S.Ct. 546, 69 L.Ed. 1032 (1925) (citation omitted) (internal quotation marks omitted). *Camara* reasoned that the type of probable cause that was required for a criminal search was not required for a routine housing inspection, which is administrative in nature and is not meant to be part of the criminal investigatory process. 387 U.S. at 535, 538-39, 87 S.Ct. 1727.

Instead, *Camara* observed that where the Fourth Amendment requires a warrant to search, "probable cause" is the "standard by which a particular decision to search is tested against the constitutional mandate of reasonableness." *Id.* at 534, 87 S.Ct. 1727. The warrant procedure is meant to "guarantee that a decision to search private property is justified by a reasonable governmental interest." *Id.* at 539, 87 S.Ct. 1727. Reasonableness, the Court concluded, "is still the ultimate standard." *Id.* The Court balanced the public's interest in conducting the inspection with the privacy interests of private citizens to determine what type of probable cause was required for an administrative search warrant. *Id.* at 535-38, 87 S.Ct. 1727. The Court concluded that, based on the balance of interests, administrative search warrants did not need to be supported by individualized suspicion. *Id.* at 537-38, 87 S.Ct. 1727 ("Where considerations of health and safety are involved, the facts that would justify an inference of 'probable cause' to make an inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken." (citation omitted) (internal quotation marks omitted)).

Appellants argue that *Camara* and *Frank*, taken together, are a sharp and radical departure from precedent because both cases deviated from an historical understanding that all warrants must be supported by individualized suspicion, including those for administrative inspections. In particular, appellants contend that administrative search warrants are analogous to the illegal English "general warrants" and "writs of assistance" discussed in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). In *Boyd*, the Court held unconstitutional a federal statute that authorized district courts in forfeiture proceedings to order the owners of the property to produce any business records that would "tend to prove any allegation made by the United States." *Id.* at 617-20, 638, 6 S.Ct. 524. The Court determined that the statute was unconstitutional because it authorized warrants similar to the writs and warrants that the Framers of the Constitution meant to eliminate. *Id.* at 630, 6 S.Ct. 524.

Several Supreme Court cases have described those objectionable writs and warrants. General warrants "specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Similarly, writs of assistance specified "only the object of the search . . . and thus left customs officials completely free to search any place where they believed such goods might be." *Id.* Under these writs and warrants, the

English government "assumed the power to search any person and any place they pleased, for the purpose of discovering violations of the laws." *State v. Pluth*, 157 Minn. 145, 195 N.W. 789, 791 (1923). In other words, they allowed essentially "unlimited discretion regarding when and where to conduct a search." *State v. Jackson*, 742 N.W.2d 163, 176 (Minn. 2007). Their "central objectionable feature" was that "they provided no judicial check" on the determination that an intrusion into a particular home was justified. *Steagald*, 451 U.S. at 220, 101 S.Ct. 1642.

We are not persuaded by appellants' suggestion that the administrative search warrant sought by the City is analogous to either general warrants or writs of assistance. Administrative search warrants under *Camara* are materially different.

Administrative search warrants must be supported by probable cause; not individualized suspicion but "reasonable legislative or administrative standards for conducting an area inspection." *Camara*, 387 U.S. at 538, 87 S.Ct. 1727. They must identify the particular place to be inspected and must be "suitably restricted." *Id.* at 539-40, 87 S.Ct. 1727. In the absence of a citizen complaint or a need for immediate entry, they must be issued only after entry is refused. *Id.* They are issued by neutral judicial officers, who must ensure that there is authority for the inspection, that reasonable standards exist, and that the inspection is not arbitrary. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). In other words, unlike general warrants and writs of assistance, an administrative search warrant under *Camara* does not authorize

"a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Here, the City's petition for an administrative search warrant did not seek authority as broad as a general warrant or a writ of assistance. The City's request was limited to verifying compliance with the city housing code and its tenor was otherwise consistent with *Camara*. Therefore, appellants' argument that an administrative search warrant would have been unconstitutional under the historical understanding of the Fourth Amendment before *Frank* and *Camara* lacks merit.

Next, appellants rely on *Boyd* to argue that the pre-*Camara* and pre-*Frank* understanding was that individualized suspicion was required not just for criminal searches, but also for administrative inspections. We disagree. *Boyd* itself stated that, although the proceeding at issue was technically civil, it was "in substance and effect a criminal one." 116 U.S. at 633-34, 6 S.Ct. 524 ("We are also clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal."). Routine housing inspections are not forfeiture proceedings, and are not typically part of a criminal investigation. They are meant to encourage and ensure compliance with a housing code. Thus, appellants have not supported their contention that probable cause of the sort required in a criminal investigation was historically required for administrative inspections, and so *Camara* was not a sharp departure.[10]

---

10. Nothing in Minnesota's legal history suggests that *Camara* departed from our state's understanding of Article I, Section 10. Appellants cite two early Minnesota cases to argue that Minnesota understood Article I, Section 10 to require probable cause supported by individualized suspicion. *See State v. Stoffels*, 89 Minn. 205, 94 N.W. 675, 676-77 (1903) (holding that statutes authorizing warrants supported by probable cause to search for

In fact, if *Camara* was a departure at all, it was a departure toward *increasing* Fourth Amendment protections. In *Frank*, the Supreme Court had allowed warrantless administrative inspections because such inspections had "antecedents deep in our history." 359 U.S. at 367, 79 S.Ct. 804. When *Camara* rejected that history and concluded that administrative warrants were required, it did so over the objection of three dissenters who argued that *Frank* should be followed and no warrant was needed. *See v. City of Seattle*, 387 U.S. 541, 546-47, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967) (Clark, J., dissenting) (writing in dissent in the companion cases of *See* and *Camara*). By overturning *Frank*, *Camara* strengthened constitutional protections for individual rights.

Finally, *Camara* cannot be termed a sharp departure because the decision applied the same approach that the Supreme Court has traditionally taken when evaluating Fourth Amendment issues. In reaching its conclusion, *Camara* applied a balancing test, weighing "the need to search against the invasion which the search entails." 387 U.S. at 537, 87 S.Ct. 1727. This is a well-established approach to the Fourth Amendment's reasonableness requirement. *See Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."). It is our approach as well. *See, e.g., State v. Kinderman*, 271 Minn. 405, 136 N.W.2d 577, 580-81 (1965) (concluding that under both the Fourth

Amendment and Article I, Section 10, "[i]n the final analysis the test is reasonableness"). As we said in *State v. Wiegand*, in which we declined to depart from federal precedent, the Supreme Court's analysis "reflects a weighing of the government's interest and the degree of intrusion on the individual that is consonant with this court's approach to search and seizure analysis under the state constitution." 645 N.W.2d 125, 132-33 (Minn. 2002). Indeed, we have departed from federal precedent that has *not* allowed such a balancing of individual interests with government interests. *See State v. Askerooth*, 681 N.W.2d 353, 362-63 (Minn. 2004) (applying Article I, Section 10 to traffic stops because relevant federal precedent's "apparent removal of any consideration of a balancing of individual interests with governmental interests troubles us").

Appellants argue that even if *Camara* employed a balancing test, *Camara* could still be termed a sharp departure based on how the Supreme Court *applied* the balancing test. In particular, appellants point out that, in *Ascher v. Commissioner of Public Safety*, we concluded that there had been a sharp departure based on how the Court balanced the relevant interests, 519 N.W.2d 183, 186 (Minn. 1994). But *Ascher* is not on point. We determined there that the Supreme Court had radically departed from precedent in concluding that no search warrant was required for a traffic roadblock because it allowed the police to "decide the reasonableness of their own conduct." *Id.* No such departure exists here because *Camara* required a warrant. 387 U.S. at 523, 534, 87 S.Ct. 1727. The determination of reasonableness is there-

and seize "intoxicating liquors illegally kept for sale" were constitutional); *Olson v. Tvete*, 46 Minn. 225, 48 N.W. 914, 914 (1891) (holding that there is an action in damages for malicious prosecution where a police officer

procured and executed a search warrant not supported by probable cause). But these two cases arose out of criminal investigations, not administrative inspections.

fore not in the hands of the inspector, but in the hands of the district court, which decides whether to issue the administrative search warrant and what the scope of the inspection will be. *Id.* at 523-24, 538-40, 87 S.Ct. 1727. We conclude that *Camara* did not represent a "sharp" or "radical" departure from precedent.[11]

## C.

Next, we consider whether *Camara* retrenched on the specific Bill of Rights issue presented in this case. *See McMurray*, 860 N.W.2d at 691. Appellants rely on the same arguments as those already discussed. For the same reasons that we conclude that *Camara* was not a departure, we determine that *Camara* did not retrench on Fourth Amendment rights.

## D.

■ Finally, we examine whether *Camara* adequately protects the rights and liberties of Minnesota's citizens. This inquiry considers whether there is a "unique, distinct, or peculiar issue[ ] of state and local concern that requires protection." *McMurray*, 860 N.W.2d at 692 (quoting *Kahn*, 701 N.W.2d at 829) (internal quotation marks omitted).

Minnesota has no established tradition of requiring individualized suspicion for administrative inspections. *See id.* (determining whether federal precedent adequately protects Minnesotans' rights by examining whether there is a long tradition of securing the right in question in the state). Instead, the record is mixed. On the one hand, in the early-to-mid twentieth century, some Minnesota cities authorized housing inspections without a warrant or individualized suspicion. *See* Duluth, Minn.,

Housing Code § 94 (1913) (stating that the health commissioner "shall cause periodic inspection to [be] made of all ... dwelling houses to ascertain whether any violations of this ordinance are being committed"); Minneapolis, Minn., Housing Code § 612 (1950) (stating that the health commissioner may make a "thorough examination" of dwellings, and occupants must "give them free access to such dwelling and premises"). On the other hand, in the mid-nineteenth century, at least one state law required probable cause with individualized suspicion for inspections by "boards of health." *See* Minn. Pub. Stat. ch. 16, §§ 3, 7 (1858) (allowing health boards to seek warrants to examine any building for "nuisances, sources of filth and causes of sickness," by making a "complaint under oath to a justice of the peace ... stating the facts of the case so far as [the health official] has knowledge thereof"). The record does not establish a long Minnesota tradition of requiring probable cause with individualized suspicion for administrative housing inspections.

Appellants argue more broadly that Minnesota has a unique history of interpreting the Minnesota Constitution to be more protective of privacy and individual rights than the United States Constitution. They rely on three cases in particular: *Carter*, 697 N.W.2d at 202-03 (departing from federal precedent to hold that the warrantless use of drug-detection dogs outside of a self-storage unit violated the Minnesota Constitution); *State v. Larsen*, 650 N.W.2d 144, 154 (Minn. 2002) (holding that a conservation officer's warrantless entry into an ice fishing house "in the absence of express consent or other circumstance justifying entry" was unreason-

---

11. In support of its argument that *Camara* is a departure, the dissent references a number of law review articles. Notably, these articles do not cite a single case holding that an administrative rental housing inspection requires individualized suspicion for a warrant to issue.

able under both the United States Constitution and the Minnesota Constitution); and *Ascher*, 519 N.W.2d at 184 (departing from federal precedent to hold that warrantless roadblocks to investigate drunk driving were unconstitutional under the Minnesota Constitution).

True, we have been more protective of home and privacy than the United States Supreme Court, but those cases involved warrantless searches. This case is fundamentally different. *Camara* requires a warrant with a neutral official determining the reasonableness of an administrative search. 387 U.S. at 538-39, 87 S.Ct. 1727.[12] This aspect of *Camara* substantially protects the rights and liberties of Minnesotans.

In addition, consistent with *Camara*, all three cases balanced individual rights and the public interest to evaluate the reasonableness of the search. *See Carter*, 697 N.W.2d at 211-12 (applying reasonable suspicion instead of full probable cause to "balance[ ] a person's expectation of privacy against the government's interest" in detecting drugs); *Larsen*, 650 N.W.2d at 150 (acknowledging that a departure from individualized suspicion may be warranted if the need "outweighed the interests of ordinary citizens"); *Ascher*, 519 N.W.2d at 186 (same); *see also State v. Davis*, 732 N.W.2d 173, 178 (Minn. 2007) ("The Minnesota Constitution protects citizens against *unreasonable* government intrusions upon areas where there is a legitimate expectation of privacy.").

Specifically, we balance "the nature and significance of the intrusion on the individual's privacy interests" and "the gravity of the public concerns it serves and the degree to which the conduct at issue advances the public interest." *Davis*, 732 N.W.2d at 178 (quoting *Larsen*, 650 N.W.2d at 148, 150) (internal quotation marks omitted). These considerations are essentially the same as those articulated in *Camara*, 387 U.S. at 534-35, 87 S.Ct. 1727 (balancing the "governmental interest which allegedly justifies official intrusion" with the "constitutionally protected interests of the private citizen"). Balancing the relevant interests in the housing regulation context leads to a different outcome than we reached in the three cases cited by appellants. We consider these interests in turn.

First, on the nature and significance of the intrusion, *Camara* acknowledged that an individual's privacy interests are heightened in the home. *Id.* at 529-31, 87 S.Ct. 1727. But the Court reasoned that routine rental housing inspections are inherently different from a criminal search. *Id.* at 530, 87 S.Ct. 1727. In particular, administrative inspections are a "relatively limited invasion of the urban citizen's privacy." *Id.* at 537, 87 S.Ct. 1727. They are "neither personal in nature nor aimed at the discovery of evidence of crime." *Id.*

In this case, under the City's ordinance, the intrusion is "relatively limited," *id.* at 537, 87 S.Ct. 1727. As the City's inspection checklist shows, housing inspections are

12. This same distinction applies to *In re Welfare of B.R.K.*, 658 N.W.2d 565 (Minn. 2003), on which appellants rely to argue that Minnesota law provides greater protection for privacy in the home than federal law. *B.R.K.* involved a warrantless entry and search of a home after a report of underage drinking. *Id.* at 568. We interpreted the Fourth Amendment and Article I, Section 10 to equally protect a short-term social guest's reasonable expectations of privacy in the host's home when the police have neither a search warrant nor an arrest warrant. *Id.* at 576, 578. Recently, in *State v. deLottinville*, 890 N.W.2d 116, 123 (Minn. 2017), we held that neither the Fourth Amendment nor Article I, Section 10 required the police to obtain a search warrant before entering a third-party's home to execute a lawfully issued arrest warrant for a guest.

not aimed at discovering concealed personal effects; rather, the inspection focuses on structural items, doors and locks, windows, kitchen sanitation, appliances, ventilation, fire protection, and electrical, plumbing, and heating systems. The tenants receive 24 hours' notice before an inspection occurs, and the inspections are conducted on a periodic schedule established by the City. Further, Minnesota law requires that before a city can inspect a rental unit, the landlord must "mak[e] a good faith effort to give the residential tenant reasonable notice under the circumstances of the intent to enter." Minn. Stat. § 504B.211, subds. 2-3 (2016).[13] These types of inspections are less intrusive than the criminal searches in *Carter*, 697 N.W.2d at 202-03 (enforcing drug laws); the random, unannounced searches in *Larsen*, 650 N.W.2d at 146 (enforcing criminal game laws); and the criminal roadblocks in *Ascher*, 519 N.W.2d at 184 (enforcing drunk-driving laws). Further, in this case, the tenants did not ask that the district court place any particular conditions on the administrative search warrant.

Appellants contend that the intrusion is significant because the city housing code is punitive in nature, rather than administrative; a violation of the code can result in a misdemeanor. But a "criminal penalty alone does not make a civil/regulatory law criminal/prohibitory." *State v. Busse*, 644 N.W.2d 79, 82, 85 (Minn. 2002) (discussing the civil/regulatory and criminal/prohibitory dichotomy in deciding whether the State had subject matter jurisdiction over a tribal member). The purpose of the city housing code, "to provide minimum standards to [protect health and safety] by regulating and controlling the use and occupancy, construction and maintenance of all residential rental units, buildings and structures within the City," is plainly administrative. City Code § 6.29, subd. 1.

Appellants respond that *Camara's* rule allows inspectors to perform plain-view searches for evidence of crimes without individualized suspicion. In particular, appellants are concerned that city inspectors can speak to police when they believe they have seen evidence of a crime. But there is no evidence in the record that, in the half-century since *Camara* was decided, Minnesota municipalities have systemically abused the rental housing inspections process or used such inspections to search for evidence of crimes.[14] Nor is there record evidence that housing inspections often generate criminal search warrants supported by individualized suspicion. *Cf. Michigan v. Clifford*, 464 U.S. 287, 294-95, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (holding that authorities may only use evidence of criminal conduct found in plain view during a valid administrative inspection to later obtain a criminal search warrant supported by individualized suspicion).

On the other side of the scale, *Camara* concluded that the public interest at stake in housing inspections is weighty. 387 U.S. at 537, 87 S.Ct. 1727. We agree. As the City's code states, housing inspections protect public health, safety, and welfare by ensuring that rental units meet the mini-

13. These limitations, along with the procedures we describe below, mitigate the dissent's concern that an inspector may search without restriction through any parts of a rental unit.

14. In their brief, appellants reference an alleged incident in which police officers accompanied a housing inspector conducting an inspection under an administrative search warrant. The City responded that the officer was necessary for the inspector's safety. This incident is based on an unsworn statement, so we do not consider it. *See State ex rel. May v. Swenson*, 242 Minn. 570, 65 N.W.2d 657, 659 (1954) (stating that unsworn statements are not proof of the facts that they assert).

mum standards of safety and functionality. City Code § 6.29, subd. 1. The public has a strong interest in preventing dangerous conditions from developing, even unknown or unintentionally, that would be hazardous to the tenants, their neighbors, and the citizens of the City as a whole. *See Camara*, 387 U.S. at 535, 87 S.Ct. 1727. As *Camara* recognized, "[t]ime and experience have forcefully taught us that the power to inspect dwelling places ... is of indispensable importance to the maintenance of community health." *Id.* (citation omitted) (internal quotation marks omitted).

Although appellants argue that alternatives to administrative search warrants exist, it is "doubtful" whether any other policy would "achieve acceptable results," *id.* at 537, 87 S.Ct. 1727. In *Ascher*, we noted that in some circumstances individualized suspicion may be so "impractical" that the public interest outweighs our citizens' privacy interests. 519 N.W.2d at 186. Here, individualized suspicion is just that impractical. Many conditions covered by housing codes, such as faulty wiring or inoperable smoke detectors, "are not observable from outside the building and indeed may not be apparent to the inexpert occupant." *Camara*, 387 U.S. at 537, 87 S.Ct. 1727. So it would be nearly impossible to obtain a warrant to inspect each unit,[15] much less do so periodically.

Ultimately, *Camara* balanced these interests and came to the well-reasoned conclusion that probable cause exists for an administrative search warrant where reasonable legislative or administrative standards for conducting an area inspection are satisfied for a particular rental unit. *Id.* at 537-38, 87 S.Ct. 1727. These standards may be based on "the nature of the building," "the condition of the [ ] area," or, as here, "the passage of time." *Id.* at 538, 87 S.Ct. 1727. Unlike *Ascher*, where we were concerned that the Supreme Court allowed police "to decide the reasonableness of their own conduct," 519 N.W.2d at 186, *Camara* protects individuals by requiring warrants for inspections issued by a neutral judicial officer, 387 U.S. at 537-38, 87 S.Ct. 1727. We reach the same conclusion as *Camara*. The *Camara* framework for administrative search warrants, properly implemented, adequately protects our citizens' basic rights and liberties.

### E.

■ For these reasons, we conclude that there is no principled basis for interpreting Article I, Section 10 of the Minnesota Constitution to require greater protection of tenants than the Fourth Amendment to the United States Constitution under these circumstances. We therefore hold that, under Article I, Sec-

---

15. There are approximately 374,100 rental units in the Minneapolis—St. Paul metro area alone. *See* U.S. Census Bureau, *2013 Housing Profile: Minneapolis—St. Paul, MN-WI* (2015), https://www2.census.gov/programs-surveys/ahs/2013/factsheets/ahs13-13_Minneapolis.pdf. The 2013 American Housing Survey found that of these rental units in Minneapolis-St. Paul, 10,000 had severe physical problems and 14,400 had moderate physical problems. U.S. Census Bureau, *AHS 2013 Metropolitan Summary Tables: Minneapolis—St. Paul*, https://www.census.gov/programs-surveys/ahs/data/2013/ahs-2013-summary-tables/metropolitan-summary-tables---ahs-2013.html (last revised Dec. 20, 2016). In response to the concurrence, it is appropriate for an appellate court to refer to U.S. Census statistics such as these. *See, e.g., Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 75, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004) (Scalia, J., dissenting) (citing American Housing Survey data not cited by the parties or amici); *State v. Jacobson*, 697 N.W.2d 610, 612 n.2 (Minn. 2005) (citing 2000 Census data); *In re Larson*, 350 N.W.2d 363, 365 (Minn. 1984) (citing 1980 census data).

tion 10 of the Minnesota Constitution, an administrative search warrant need not be supported by individualized suspicion of a code violation when the warrant issued by a district court satisfies an ordinance containing reasonable standards.

## II.

Finally, we take this opportunity to clarify the appropriate procedure for district courts to use when considering a petition for an administrative search warrant. We do so because tenants have a "very tangible interest in limiting the circumstances under which the sanctity of [their] home may be broken by official authority" and so have a "constitutional right to insist that the inspectors obtain a warrant to search." *Camara*, 387 U.S. at 531, 540, 87 S.Ct. 1727.

■ First, absent an emergency or other compelling need, a petition for an administrative search warrant should not be granted ex parte. In civil proceedings, our rules usually require that both sides receive reasonable notice and an opportunity to be heard. *See, e.g.*, Minn. R. Civ. P. 56.03 (requiring notice before a summary judgment motion may be heard); Minn. R. Civ. P. 65.02(a) (requiring notice before the issuance of a temporary injunction). But in limited circumstances, such as for temporary restraining orders, ex parte orders are allowed when necessary.[16] Similarly, absent compelling need, district courts should not issue administrative search warrants if the petitioner has not provided reasonable notice to tenants.

■ Second, at a hearing on a petition for an administrative search warrant, the tenant must be given the opportunity to be heard and to advocate for reasonable restrictions to the warrant. We have long held that the opportunity to be heard "is absolutely essential." *State ex rel. Blaisdell v. Billings*, 55 Minn. 467, 57 N.W. 794, 795 (1894).

■ Third, a district court considering a request for an administrative search warrant must take care to impose a "suitably restricted search warrant," *Camara*, 387 U.S. at 539, 87 S.Ct. 1727, regardless of whether the tenant attends or is represented at the hearing. Restrictions on the timing and scope of the inspection may be reasonable. If the applicant for the warrant has not disclosed it, the district court may also inquire into the extent of police presence, if any, planned for the inspection and the appropriateness of that presence. Typically, absent a threat of danger, the police will not be participating in the inspection within the premises. Ultimately, the district court should use its sound discretion to determine the particular limitations on the administrative warrant based on the needs of the particular tenant and inspector. Taken together, these requirements will ensure a fair procedure when application is made for an administrative search warrant.

In summary, we discern no principled basis to depart from the legal framework our nation's highest court announced a half-century ago so as to interpret the Minnesota Constitution differently than

---

**16.** Specifically, under Minn. R. Civ. P. 65.01, a temporary restraining order may be granted without notice to the adverse party only if it "clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard" and the applicant states to the court the "efforts, if any, which have been made to give notice or the reasons supporting the claim that notice should not be required." This rule restricts ex parte orders to those situations in which notice is not feasible or would be harmful.

the United States Constitution. To do otherwise would do what no other state supreme court has done. This is not to say that, when Minnesotans' liberty interests are at stake, we are not willing to consider novel, thoughtful arguments. We have done so—carefully—here. And, in so doing, we have given guidance that protects Minnesotans' privacy, health, and safety.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

Concurring, Gildea, C.J.

Dissenting, Anderson, Stras, JJ.

## CONCURRENCE

GILDEA, Chief Justice (concurring).

I agree with the result the majority reaches and join much of the opinion. There are, however, three parts of the opinion that I do not join and I write separately to explain my disagreement on these matters.

First, I do not join in Part I.A. of the opinion. In this section, the opinion purports to resolve a punctuation issue in Article I, Section 10 of the Minnesota Constitution. As the majority acknowledges, the issue about the semicolon was not raised below or briefed by the parties. *See Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 898 n.7 (Minn. 2006) (declining to address issues raised by an amicus curiae that were neither argued below nor within "the scope of the briefing order given by [the] court to the parties"). As a result, I would not reach this issue.

Second, I do not join the opinion's reliance upon the U.S. Census Bureau data,

*supra* at 167 n.15. This data is not in the record and we should not rely on matters outside the record to decide this case. *See Thiele v. Stich*, 425 N.W.2d 580, 582-83 (Minn. 1988) ("An appellate court ... may not consider matters not produced and received in evidence below.").

Third, I do not join in Part II of the opinion, which imposes specific procedures on district court judges to use when they consider petitions for administrative search warrants. In *Camara v. Municipal Court*, 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the United States Supreme Court stated that, when probable cause is satisfied, a judge may issue a "suitably restricted search warrant." I would leave the implementation of *Camara's* charge to the discretion of our very able district court judges to handle on a case-by-case basis.

## DISSENT

ANDERSON, Justice (dissenting).

Today, the court holds that, so long as the city has a reasonable standard for choosing the homes to be searched, city officials can search a home without any suspicion of wrongdoing. The Supreme Court of the United States has held that similar searches do not violate the Fourth Amendment. *Camara v. Mun. Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The court recognizes that Minnesotans also are protected by Article I, Section 10 of the Minnesota Constitution, but it concludes that our constitution provides no more protection than the Fourth Amendment.

Because I conclude that the search that Golden Valley (the City) seeks to perform would violate Article I, Section 10, I respectfully dissent.[1]

---

1. The court notes that no state supreme court

has interpreted its state constitution more

### I.

State constitutions "are a separate source of citizens' rights" and may provide greater protection than the United States Constitution. *Kahn v. Griffin*, 701 N.W.2d 815, 824 (Minn. 2005). Thus, I begin by addressing *Kahn*. The parties appear to assume that *Kahn* provides an exhaustive list of circumstances in which we will interpret the Minnesota Constitution more broadly than the United States Constitution. The court follows suit and applies the *Kahn* framework to its analysis. But *Kahn* need not, and should not, be interpreted this way. *Kahn* itself is not as broad as the court makes it out to be.

In *Kahn*, we thoroughly reviewed our case law interpreting the Minnesota Constitution. *Id.* at 824-28. We acknowledged that "[o]ur approach to interpreting the Minnesota Constitution has evolved over the past century." *Id.* at 825. Specifically, we noted that during the late 19th century and the first half of the 20th century, we took a "cautious approach" and generally followed federal interpretations of the United States Constitution. *Id.* at 825-26. But since the 1970s, we have "exhibited a greater willingness" to interpret the Minnesota Constitution independently. *Id.* at 827. We concluded that "[i]t is now axiomatic that we can and will interpret our state constitution to afford greater protections of individual civil and political rights than does the federal constitution" because we are the "first line of defense for individual liberties within the federalist system." *Id.* at 828 (quoting *State v. Fuller*, 374 N.W.2d 722, 726 (Minn. 1985)).

We then summarized our case law, stating that when the Minnesota Constitution uses substantially similar language to the United States Constitution, we will interpret the Minnesota Constitution independently if (1) "the United States Supreme Court has made a sharp or radical departure from its previous decisions or approach to the law," (2) "the Supreme Court has retrenched on Bill of Rights issues," or (3) "federal precedent does not adequately protect our citizens' basic rights and liberties." *Id.*

But we have never held that this list exhaustively describes the *only* situations in which we independently interpret our own constitution. To the contrary, *Kahn*'s description of our "greater willingness" to depart from federal precedent in recent decades suggests that the list simply describes situations in which we have most commonly done so. Indeed, *Kahn* can be viewed as a response to a perceived retrenchment on Warren Court decisions by later decisions occurring in the Burger and Rehnquist eras. For example, *Kahn* stated that our willingness to interpret the Minnesota Constitution more broadly than the United States Constitution was "motivated in part by the Supreme Court's recent willingness to narrow the ambit of the Fourth and Fourteenth Amendments." *Id.* at 827. *Kahn* cited *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001), and *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), as examples of the Supreme Court's narrowing of individual rights since the Warren Court era. *Kahn*, 701 N.W.2d at 827. *Kahn*, at least implicitly, assumes that principles announced in decisions by the Warren Court are more consistent with a Minnesota legal tradition that is generally protective of individual rights.

broadly than *Camara*. Although this observation is correct, it is also incomplete. No state supreme court has interpreted its state constitution more broadly than *Camara* because no

state, before ours, has directly addressed the issue of whether their state constitution provides more protection than *Camara* for routine inspections of housing code violations.

In short, nothing in *Kahn* purports to limit our ability to analyze our state constitution independently based on its text, structure, and history. In fact, *Kahn* emphasized that "[o]n *all* occasions, we will exercise our independent judgment as to how to interpret the Minnesota Constitution." *Id.* at 828 (emphasis added); *see also Jarvis v. Levine*, 418 N.W.2d 139, 147 (Minn. 1988) (explaining our independent responsibility "for safeguarding the rights of [Minnesota] citizens" when "significant state law issues [are] involved," and deciding a privacy claim "exclusively under Minnesota statutes and our Minnesota Constitution" (citation omitted) (internal quotation marks omitted)).

Because *Kahn* does not foreclose our independent consideration of the Minnesota Constitution, I now exercise my constitutional duty to analyze Article I, Section 10's text, structure, and history.[2]

## II.

The lodestar of constitutional analysis is the text of the constitution. *Schowalter v. State*, 822 N.W.2d 292, 300 (Minn. 2012) ("When resolving a constitutional issue, we look first to the language of the constitution."). We have compared Article I, Section 10 and the Fourth Amendment in various ways, noting that the provisions are "substantially similar," *State v. McMurray*, 860 N.W.2d 686, 689 (Minn. 2015), and "textually identical," *State v. Carter*, 697 N.W.2d 199, 209 (Minn. 2005). But we have recognized, correctly, that there are differences in punctuation between the two provisions. *State v. deLottinville*, 890 N.W.2d 116, 122 n.1 (Minn. 2017). Specifically, in the United States Constitution, the warrant clause is separated from the reasonableness clause by a comma; in the Minnesota Constitution, the two clauses are separated by a semicolon.[3] The language of the two provisions is as follows:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no

**2.** In this case, it is unnecessary to decide whether *Kahn* correctly analyzed the precedents that it cites. I also note that it is highly doubtful that *Kahn* could restrict our court, or any future court, from fulfilling its constitutional responsibilities to independently interpret the Minnesota Constitution. *See* Minn. Const. art. V, § 6. The Supreme Court has told us that it is obligated to respect our interpretations of state law, not the other way around, regardless of any resulting lack of uniformity. *See Danforth v. Minnesota*, 552 U.S. 264, 280, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008) ("[U]niformity, however, does not outweigh the general principle that States are independent sovereigns with plenary authority to make and enforce their own laws so long as they do not infringe on federal constitutional guarantees.... Nonuniformity is, in fact, an unavoidable reality in a federalist system of government."); *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) ("Our reasoning ..., however, does not *ex proprio vigore* limit the authority of the State to exercise ... its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution."); *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 60 (Minn. 2012) (adopting an interpretation of the jury trial right under the Minnesota Constitution that was different from most federal courts' interpretation of the Seventh Amendment to the United States Constitution). But, as with other *Kahn*-related issues, this topic can await another day.

**3.** The court asserts that the parties did not raise this argument. But deciding whether the search warrant should issue necessarily requires us to read and interpret the text of the Minnesota Constitution, which is the document that controls our analysis, to determine the level of suspicion that Article I, Section 10 mandates, particularly when, as here, the tenants have argued that the Minnesota Constitution provides more protection than the United States Constitution.

warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

Minn. Const. art. I, § 10.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The punctuation differences are significant in a novel way here.[4] Previously, we have noted that semicolons join "two clauses that are related in topic but nevertheless [are] independent of one another." *Schroeder v. W. Nat'l Mut. Ins. Co.*, 865 N.W.2d 66, 70 (Minn. 2015). On the other hand, commas "indicate[ ] the smallest break in sentence structure" and "denote[ ] a slight pause." *The Chicago Manual of Style* ¶ 6.18 (15th ed. 2003). Since the 1700s, a comma has been used to signify "a point, by which a period is subdivided into its least constructive parts." David S. Yellin, *The Elements of Constitutional Style: A Comprehensive Analysis of Punctuation in the Constitution*, 79 Tenn. L. Rev. 687, 715 (2012) (emphasis omitted) (citation omitted) (internal quotation marks omitted). Therefore, basic rules of grammar lead to the conclusion that the semicolon in Article I, Section 10 textually creates two *independent* requirements in a way that the United States Constitution does not: first, that Minnesotans have a right "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures" and second, that "no warrant shall issue but upon probable cause," Minn. Const. art. I, § 10.[5]

The court attempts to dismiss the semicolon as a mere typographical error. But

4. Although previously we have not emphasized this grammatical distinction between the two constitutions, this dispute is our first opportunity to do so. In all of the cases in which we have said that Article I, Section 10 is "textually identical" to the Fourth Amendment, we were addressing searches conducted without a warrant. *See McMurray*, 860 N.W.2d at 688, 689 n.1; *State v. Bartylla*, 755 N.W.2d 8, 11-12, 18 (Minn. 2008); *Carter*, 697 N.W.2d at 202-03, 209; *State v. Wiegand*, 645 N.W.2d 125, 128-29, 132 (Minn. 2002); *In re Welfare of E.D.J.*, 502 N.W.2d 779, 780-81 (Minn. 1993). Today, for the first time, we authorize the issuance of a warrant under the Minnesota Constitution without satisfying the element of probable cause, at least as that concept has been traditionally understood.

5. The historical record is silent on the subject of punctuation in Article I, Section 10 of the Minnesota Constitution. Both the Republican and Democratic drafts of the Minnesota Constitution used commas, but by 1905 the semicolon had appeared in the version of the Minnesota Constitution published in Minnesota Revised Laws, *see* Minn. Const. of 1857, art. I, § 10 (1905), by 1913 it had appeared in Minnesota General Statutes, *see* Minn. Const. of 1857, art. I, § 10 (1913), and by 1941 it had appeared in Minnesota Statutes, *see* Minn. Const. of 1857, art. I, § 10 (1941). These differences are nowhere explained. But what is relevant to our discussion today is that the Minnesota Constitution now has a semicolon and this version of Article I, Section 10 was reaffirmed when voters approved revisions to the Minnesota Constitution in 1974. By 1974 the semicolon had appeared in the Minnesota Constitution for over 60 years and the full text of the proposed revisions to the constitution was published before the 1974 election. *See* Minn. Const. art. I, § 10; Act of Apr. 10, 1974, ch. 409, 1974 Minn. Laws 787, 787-820.

In light of this history, the court's attempt to assert that voters were unaware of the semicolon must be disregarded. Not only is the court's claim a bare assertion, that assertion then raises the issue of what other provisions of the constitution should be ignored because, in the court's judgment, voters were unaware of those provisions.

28 states use a semicolon to separate the warrant clause from the reasonableness clause in their own constitutions. *See* Ark. Const. art. 2, § 15; Cal. Const. art. I, § 13; Colo. Const. art. II, § 7; Conn. Const. art. I, § 7; Del. Const. art. I, § 6; Ga. Const. art. I, § I, ¶ XIII; Haw. Const. art. I, § 7; Idaho Const. art. I, § 17; Ind. Const. art. 1, § 11; Iowa Const. art. 1, § 8; Kan. Const. Bill of Rights § 15; Ky. Const. art. I, § 10; Me. Const. art. I, § 5; Minn. Const. art. I, § 10; Miss. Const. art. 3, § 23; Mo. Const. art. I, § 15; Neb. Const. art. I, § 7; Nev. Const. art. 1, § 18; N.J. Const. art. I, ¶ 7; N.D. Const. art. I, § 8; Ohio Const. art. I, § 14; Okla. Const. art. II, § 30; Or. Const. art. I, § 9; R.I. Const. art. I, § 6; Tenn. Const. art. I, § 7; Utah Const. art. I, § 14; Vt. Const. ch. I, art. 11; Wis. Const. art. I, § 11. Nine states use a period. *See* Alaska Const. art. I, § 14; Fla. Const. art. I, § 12; Ill. Const. art. I, § 6; La. Const. art. I, § 5; Mass. Const. pt. 1, § 15, art. XIV; Mich. Const. art. I, § 11; Mont. Const. art. II, § 11; N.H. Const. pt. 1, art. 19; W. Va. Const. art. III, § 6. And, eight use a comma. *See* Ala. Const. art. I, § 5; N.M. Const. art. II, § 10; N.Y. Const. art. I, § 12; Pa. Const. art. I, § 8; S.C. Const. art. I, § 10; S.D. Const. art. VI, § 11; Tex. Const. art. I, § 9; Wyo. Const. art. 1, § 4. These differences in punctuation cannot be ignored; they must mean *something*. *See State v. Short*, 851 N.W.2d 474, 500-01 (Iowa 2014) (noting that the Iowa Constitution uses a semicolon where the United States Constitution uses a comma and concluding that "the semicolon illustrates . . . that in order to avoid being declared 'unreasonable' or unlawful, under [the Iowa Constitution], a warrant is ordinarily required."); *State v. Ochoa*, 792 N.W.2d 260, 268-69 (Iowa 2010) (relying in part on the semicolon separating the warrant clause and the reasonableness clause in the Iowa Constitution to hold that "the Reasonableness Clause cannot be used to override the Warrant Clause," even though there was "no contemporaneous explanation of the use of the semicolon"). It is farfetched for the court to claim that 28 states have somehow made precisely the same typographical error.[6]

Furthermore, the word "and" does not change the function of the semicolon. In Article I, Section 10, "and" functions as a copulative conjunction, which "denote[s] addition" and signifies that "[t]he second clause states an additional fact that is related to the first clause." *The Chicago Manual of Style* ¶ 5.183. Even the dictionary that the court cites to define "and" also defines it as "in addition to; as well as," *The American Heritage Dictionary of the English Language* 66 (5th ed. 2011), meaning that Article I, Section 10 imposes a reasonableness requirement in addition to the warrant requirement. In short, the court's attempt to dismiss the semicolon is unavailing, as a matter of both history and grammar.

The administrative search warrant that the City requests in this case violates the independent right of Minnesotans to insist on a warrant supported by probable cause. Article I, Section 10 categorically states that "no warrant shall issue but upon prob-

---

**6.** That some of these states have not yet discussed these differences in punctuation does not mean that they are irrelevant. It is worth noting that three of the cases cited by the majority involved warrantless searches. *See People v. Collins*, 438 Mich. 8, 475 N.W.2d 684, 684 (1991); *State v. Lloyd*, 129 Nev. ——, 312 P.3d 467, 468 (2013); *Gomez v. State*, 168 P.3d 1139, 1141 (Okla. Crim. App. 2007). The remaining case involved a search accompanied by individualized suspicion. *See Holbrook v. Knopf*, 847 S.W.2d 52, 53 (Ky. 1992) (explaining that the defendants had already been indicted). Therefore, just as the semicolon has not been relevant in our prior decisions, it was not relevant in the decisions cited by the majority because none of them authorized a warrant without individualized suspicion.

able cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized." Minn. Const. art I, § 10. Critically, Article I, Section 10 contains an unambiguous prohibition (i.e., "no warrant shall issue") on the issuance of any warrant unless probable cause is present. Therefore, we must determine whether "probable cause" refers to our historical understanding of the concept or the loose standard articulated by the court that does not require any individualized suspicion.

Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Carter*, 697 N.W.2d at 204-05 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Probable cause requires "known facts and circumstances [that] are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *State v. Lee*, 585 N.W.2d 378, 382 (Minn. 1998) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). In other words, although "articulating precisely what ... 'probable cause' mean[s] is not possible," *id.* (quoting *Ornelas*, 517 U.S. at 695, 116 S.Ct. 1657), it is clear that there must be some reason to suspect that the particular person or place to be searched will contain evidence of a crime or violation—that is, individualized suspicion must be present. The City does not even suggest that it meets this standard here.

The court dismisses, entirely too quickly in my view, what I regard as a well-grounded claim by appellants that the kind of warrant at issue here is remarkably similar to general warrants and writs of assistance, the prohibition of which was the primary motivation behind the Fourth Amendment. General warrants, a source of unbridled investigative discretion, specified only an offense and allowed the executing officials to determine which people to arrest and what places to search. *Steagald v. United States*, 451 U.S. 204, 220, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Similarly, writs of assistance specified the object of the search and allowed officials to choose where to search for the object. *Id.* The problem with general warrants "is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings." *State v. Miller*, 666 N.W.2d 703, 712 (Minn. 2003) (quoting *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)). They were also objectionable because "they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home." *Steagald*, 451 U.S. at 220, 101 S.Ct. 1642.

The supporting affidavit submitted by the City's inspector shows that, like a general warrant, the search here would be "a general, exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In paragraph 28, the affidavit claims a need for an administrative warrant "to determine whether [the property] complies with the standards set out in Golden Valley City Code § 4.60, other provisions of the City Code, and state law." The housing inspector has no idea what violations, if any, of city or state laws he might find in this home; he is simply seeking what amounts to a blanket authorization to rummage through the home as part of his search for any code, statutory, or ordinance violations.[7]

---

7. There are many state laws that might apply to landlords and tenants. For example, the

Minnesota Building Code incorporates many additional, different codes, all with detailed

Indeed, the City concedes that it has no particular reason to suspect that the home in question has any code violations and admits that it does not have any individualized suspicion of wrongdoing on the part of either the landlords or tenants; the City's sole argument in favor of the warrant is that 3 years have passed since the last inspection. This constitutes probable cause that 3 years have passed since an inspector has last seen the property, but not probable cause of any wrongdoing or even that a code violation *might* exist. Under the City's approach, which the court adopts, obtaining the administrative search warrant is a mere formality. The issuing judge will simply confirm that the City Code authorizes routine inspections and that the particular rental unit is due for an inspection. The warrant process approved by the court today is a classic fishing expedition; it is, at a minimum, judicial authorization of a close cousin of the general warrants and writs of assistance that so concerned the drafters of both the United States and the Minnesota Constitutions that they imposed a specific standard for warrants. *See Steagald*, 451 U.S. at 220, 101 S.Ct. 1642; *State v. Jackson*, 742 N.W.2d 163, 169 (Minn. 2007) (explaining that provisions of the Fourth Amendment were adopted "in part [as] a reaction to the general warrants ... and the writs of assistance").

In an effort to get around this barrier, the court concludes that the constitutional requirement of probable cause applies only to criminal investigations and that proba-

ble cause means something very different for administrative investigations. All that is required for the latter category, according to the court, is a hybrid general warrant/writ of assistance with a few restrictions attached. There are several problems with this approach.

First, and perhaps most critically, there is no textual support for differing probable cause standards for administrative and criminal searches. Article I, Section 10 speaks only of probable cause and gives no hint that the standard depends on the type of search conducted. Certainly, the convenience of the government, the very body against which Article I, Section 10 protects, is not a valid basis on which to alter the constitutional standard. *See, e.g., State v. Larsen*, 650 N.W.2d 144, 150 n.5 (Minn. 2002) ("[E]ase in enforcing the law has never been a sufficient justification for government intrusion.").

Second, anchoring this new definition of probable cause in the differences between administrative warrants and criminal warrants has no historical basis. The complex administrative and regulatory framework that exists today was unknown at common law when both constitutions were adopted.[8]

In any event, the distinction is likely incorrect. Calling these proceedings civil does not make them so. Violation of the housing code is a misdemeanor, punishable by up to 90 days and a fine of $700. Golden Valley, Minn., City Code ch. 1, § 1.02, subd. 13; ch. 6, § 6.29, subd. 16 (2015). Although many of the responsibilities of

requirements that a landlord or tenant must meet. *See* Minn. R. 1300.0050 (2015) (listing the Minnesota Building Code, Minnesota Residential Code, Minnesota Conservation Code for Existing Buildings, Minnesota Electrical Code, Minnesota Accessibility Code, Minnesota Mechanical Code, Minnesota Plumbing Code, and 14 other similar codes as chapters of the Minnesota State Building Code).

**8.** It would not be correct, however, to assert that administrative law is entirely a modern creation. Administrative law, and concerns about the reach of the administrative state, were present in early British common law and were also present at the founding of the Republic. *See* Philip Hamburger, *Is Administrative Law Unlawful?* 277-81 (2014) (tracing the history of the development of, and resistance to, administrative law).

code compliance are placed on the landlord, tenants also are subject to criminal prosecution for some code violations. *See, e.g.*, 2012 Int'l Prop. Maint. Code §§ 106.3, 106.4, 301.2, 302.1, 305.1, 308.2, 308.3 (Int'l Code Council, Inc. 2011). *See also Larsen*, 650 N.W.2d at 146 (explaining that a conservation officer's unannounced entry into fish house with "no reason to suspect a violation of fishing laws" resulted in criminal charges both for a fishing law violation and for drug possession). And, as Professor Philip Hamburger observes, "all government proceedings brought on behalf of the government for penalties or correction have long been considered criminal." Philip Hamburger, *Is Administrative Law Unlawful?* 229 (2014).

The City admits that it "has a policy of police presence" for every rental inspection conducted under an administrative warrant and that their presence, of course, raises the possibility of investigation and prosecution of unrelated violations of law. This is not an uncommon practice. *See Frank*, 359 U.S. at 361, 79 S.Ct. 804 (noting that the city inspector was accompanied by two police officers); *Jones v. Wildgen*, 450 F.Supp.2d 1265, 1269 (D. Kan. 2006) (stating that police accompanied housing inspectors during the search), *aff'd*, 244 Fed.Appx. 859 (10th Cir. 2007); *State v. Saturno*, 322 Conn. 80, 139 A.3d

629, 635 (2016) (stating that the city's standard policy was to conduct administrative searches with two police officers); Nicole Stelle Garnett, *Ordering (and Order in) the City*, 57 Stan. L. Rev. 1, 13-19 (2004) (describing housing "sweeps" in which cities have paired housing inspectors with police officers in an effort to reduce crime).[9] Even when police do not accompany the housing inspector, evidence discovered during housing inspections has been used to convict the tenant or homeowner of a crime. *See, e.g.*, *State v. Wiley*, 295 Minn. 411, 205 N.W.2d 667, 669-70 (1973) (affirming a conviction for possession of marijuana when the police investigation was initiated based on a housing inspector informing police that he saw marijuana in the defendant's garage); *State v. Browning*, 67 Wash.App. 93, 834 P.2d 84, 85-87 (1992) (reversing convictions for possession of a controlled substance with intent to deliver because the convictions were based on information given to police by a housing inspector who entered the residence without the occupants' consent).

Because the City does not claim to have individualized suspicion that this particular home contains code violations, the City is requesting a search warrant lacking probable cause. The warrant clause in Article I, Section 10 prohibits issuance of warrants without probable cause[10] and thus, I would

9. A municipal decision to have police assistance in serving administrative warrants may well be a reasonable and sensible safety precaution from a practical perspective and it is not my point here to criticize that practice. But this difficulty of separating civil law issues from criminal law issues based on the administrative nature of housing-inspection search warrants is additional evidence of the weak rationale for the court's decision today.

10. The court argues that this interpretation of Article I, Section 10 would require a warrant based on individualized suspicion for most administrative inspections. Because the court finds such a result undesirable, it concludes

that this interpretation of the constitution could not have been intended by the framers.

We need not decide now whether individualized suspicion would be required in the other contexts that the court mentions. But I note that the best evidence of the intent of the framers is the plain language of the constitution. *State ex rel. Gardner v. Holm*, 241 Minn. 125, 62 N.W.2d 52, 55 (1954) ("[W]here the language used is clear, explicit, and unambiguous, the language of the provision itself is the best evidence of the intention of the framers of the constitution."). Because the plain language of Article I, Section 10 is clear, it is unnecessary to consider the statutes from the

hold that the warrant application must be denied.[11]

## III.

I would also conclude that, separate and distinct from the warrant clause discussed above, the search that the City seeks to perform violates the reasonableness clause in Article I, Section 10. *See State v. Burbach*, 706 N.W.2d 484, 488-89 (Minn. 2005) (holding that a search was unreasonable under Minn. Const. art. I, § 10).

In analyzing whether searches and seizures violate the reasonableness clause of Article I, Section 10, we balance "the nature and significance of the intrusion on the individual's privacy interests" against "the gravity of the public concerns [that the search] serves and the degree to which [the search] advances the public interest." *Larsen*, 650 N.W.2d at 148. I acknowledge that the City has some strong public health and safety interests at stake here. It is important to ensure that rental units do not contain dangers that might threaten those living in and around the units. But the City's interest does not outweigh the significant privacy intrusion of the search, particularly when the City has not shown

19th and early 20th centuries that the court cites as evidence of the framers' intent. But even considering these statutes, we have previously recognized that longstanding violations of the constitution are not sufficient to ignore the plain language. *See Gardner*, 62 N.W.2d at 60 ("No unchallenged exercise of a power not granted to a branch of our government can serve to confer upon it such power when the clear language of the constitution ... denies to it such power...."). Finally, even if routine nonconsensual inspections are good policy, such policy considerations cannot override the plain text of the constitution. *See State v. Lessley*, 779 N.W.2d 825, 840 (Minn. 2010) (emphasizing that when interpreting the constitution "the question before us is not whether [a particular interpretation] might be wise policy").

11. The court discusses *Camara* and *Frank* and accurately sets out the current state of federal law. But what is not clear from the court's summary is how much *Frank* and *Camara* deviated from the historical understanding of the Fourth Amendment. There is significant scholarly research on this point, noting the Court's creation of a previously unknown form of administrative warrant. *See, e.g.,* Edwin J. Butterfoss, *A Suspicionless Search and Seizure Quagmire: The Supreme Court Revives the Pretext Doctrine and Creates Another Fine Fourth Amendment Mess*, 40 Creighton L. Rev. 419, 420 (2007) ("The door to suspicionless searches and seizures under the Fourth Amendment was opened in the landmark case of *Camara* ... when the Court for the first time authorized a search without a showing of individualized suspicion."); Orin S. Kerr,

*The Modest Role of the Warrant Clause in National Security Investigations*, 88 Tex. L. Rev. 1669, 1673 (2010) ("In *Camara*, the Court overruled *Frank* and held that a warrant was required for such inspections. But there was a catch: the warrant that was required was unlike any warrant previously known."); David A. Koplow, *Arms Control Inspection: Constitutional Restrictions on Treaty Verification in the United States*, 63 N.Y.U. L. Rev. 229, 307-08 (1988) ("The major creative act of *Camara* ... was the articulation of an unprecedented apparatus for authorizing administrative search warrants and subpoenas.... [T]he warrant must be issued by an impartial magistrate, but only upon a showing of a special type of probable cause that merely requires the inspecting agency to demonstrate that it has established rational standards guiding the sequence of inspection, and that the proposed subject of the investigation fits into that scheme."); Scott E. Sundby, *A Return to Fourth Amendment Basics: Undoing the Mischief of Camara and Terry*, 72 Minn. L. Rev. 383, 386-87 (1988) ("Prior to *Camara*.... [a]lthough reasonableness sometimes necessitated making an exception for obtaining a warrant, probable cause remained sacrosanct, immune from modification even in the name of reasonableness.").

The court's argument that these articles do not cite a case in which individualized suspicion was required for a rental inspection misses the point. The court has failed to cite a single case decided before *Camara* that authorizes *any* type of warrant without individualized suspicion.

that alternative means are inadequate to achieve the City's interest.

First, the privacy interest is substantial. We have said that "the home is 'first among equals' ... representing the 'very core' of a person's constitutional protections" and that privacy rights "are at their apex in one's own home." *deLottinville*, 890 N.W.2d at 120 (quoting *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013)). We have consistently recognized special privacy interests in a home. *State v. Eichers*, 853 N.W.2d 114, 125 (Minn. 2014) ("[T]he home is 'the most private and inviolate (or so we expect) of all the places and things the Fourth Amendment protects'...." (quoting *Jardines*, 569 U.S. at ——, 133 S.Ct. at 1418 (Kagan, J., concurring))); *McCaughtry v. City of Red Wing*, 831 N.W.2d 518, 528 (Minn. 2013) ("A citizen's private residence is the place where that citizen's privacy interest is most heightened and our constitutional protections are at their greatest."); *Carter*, 697 N.W.2d at 208 ("[A] home [is] where a person's expectations of privacy are most heightened.").

In fact, the home has been the standard by which we have compared privacy expectations in other property in evaluating Fourth Amendment and Article I, Section 10 claims. *See, e.g., State v. Milton*, 821 N.W.2d 789, 799 (Minn. 2012) (noting that there is a reasonable expectation of privacy in a home's curtilage because "the intimate activity associated with the sanctity of a man's home and the privacies of his life" extends to this area and "curtilage is so immediately and intimately connected to the home" (citations omitted)); *State v. Wiegand*, 645 N.W.2d 125, 130-31 n.5 (Minn. 2002) ("[L]ong-standing precedent establishes that the expectation of privacy in an automobile is diminished as compared to a home...."). For example, in *Larsen*, we held that individualized suspi-

cion was required to search an ice-fishing house because such houses are "erected and equipped to protect [their] occupants from the elements and often provid[e] eating, sleeping, and other facilities." 650 N.W.2d at 149. We concluded that although an ice-fishing house is "clearly not a substitute for one's private dwelling, during the period of occupancy important activities of a personal nature take place" inside the structure. *Id.*

Similarly, in *Carter* we noted that a person has a substantial privacy interest in a storage unit because it is "large enough to contain a significant number of personal items and even to conduct some personal activities" inside and "the dominant purpose for such a unit is to store personal effects in a fixed location." 697 N.W.2d at 210-11. This reasoning applies with added force to a home, where people store most of their personal effects and conduct their most personal activities.

Second, the intrusion on the privacy of the home is significant here. The search warrant sought would allow the inspector to search the rental unit "to determine compliance with Golden Valley City Code § 4.60." Section 4.60 adopts by reference the 2012 International Property Maintenance Code with some modifications. Golden Valley City Code § 4.60, subd. 1 (2015). With these modifications, the 2012 International Property Maintenance Code, as adopted by Golden Valley, incorporates by reference the Minnesota Building Code, the Minnesota Fire Code, the Minnesota Mechanical Code, the Minnesota Plumbing Code, and several other similar codes or standards. Golden Valley City Code § 4.60, subd. 2.GG-HH, LL-SS (2015). The International Code makes clear that "[c]ompliance with the referenced standard is necessary for compliance with this code." 2012 Int'l Prop. Maint. Code at ix.

The breadth of the requirements found in the 2012 International Property Maintenance Code is extensive and would allow a search to occur virtually anywhere in the unit. It requires that tenants "keep that part of the structure which they occupy or control in a clean and sanitary condition." *Id.* § 305.1. It prohibits "peeling, chipping, flaking or abraded paint" in the unit. *Id.* § 305.3. It prohibits pest infestation. *Id.* § 309. It mandates specified room dimensions, window sizes, and ceiling heights. *Id.* §§ 402-04. It requires minimum room and water temperatures. *Id.* §§ 505.4, 602.2. It dictates the minimum number of electrical outlets and lights in each room. *Id.* §§ 605.2, 605.3. It even prohibits disposing of garbage in unapproved disposal facilities or containers. *Id.* § 308.3. These are just a selected few of the many requirements incorporated into the Golden Valley City Code from other codes that an inspector executing an administrative search warrant will be required to enforce against owners and tenants. It is difficult to conceive of a more invasive search, and it is a search authorized without the traditional protections afforded by the requirement of probable cause.

The intrusion here, authorized by the court's decision, is greater than other intrusions for which we have required individualized suspicion. For example, in *Ascher v. Commissioner of Public Safety*, we required individualized suspicion for a brief 2-minute traffic stop to identify drunk drivers. 519 N.W.2d 183, 184 (Minn. 1994). In *Carter*, we required reasonable,

articulable suspicion for a dog sniff of a storage unit. 697 N.W.2d at 212. And in *Larsen*, we required individualized suspicion for the administrative search of an ice-fishing house to ensure compliance with fishing regulations. 650 N.W.2d at 154. Because Article I, Section 10 requires individualized suspicion for these searches, it also should require individualized suspicion for administrative inspections of rental-housing units, where the greatest of privacy interests are at stake.[12]

Third, the City has not shown that other means of achieving its interest would be inadequate. In *Ascher*, we held that Article I, Section 10 prohibits the State from setting up sobriety checkpoints, in which all drivers are stopped in an effort to identify impaired drivers. 519 N.W.2d at 187. We held that individualized suspicion was required because the State had not shown that it was impractical to develop individualized suspicion or that the roadblock would "significantly help" achieve a higher arrest rate than other methods of enforcement. *Id.* at 186-87. Yet here, the court assumes—with no evidence—that no other method of enforcement would achieve acceptable levels of compliance. But other cities have adopted different, less intrusive, methods of enforcement. For example, Richmond, California requires housing inspectors to have "reasonable cause . . . to believe that a violation of the Municipal Code or State law exists on the subject property." Richmond, Cal., Municipal Code art. VI, ch. 6.40, § 6.40.060(e) (2016).

---

**12.** The court concludes that the searches in *Ascher, Carter,* and *Larsen* were more intrusive than rental housing inspections because *Ascher* and *Carter* were criminal searches and *Larsen* was an unannounced search. As an initial matter, *Ascher* and *Carter* are not so easily distinguishable because the presence of code violations can lead to a misdemeanor conviction. *See* Golden Valley City Code ch. 1, § 1.02, subd. 13; *id.*, ch. 6, § 6.29, subd. 16.

Even so, the search in *Ascher* also was significantly briefer than the search proposed here. 519 N.W.2d at 184. The search in *Carter*, a dog-sniff case, did not even require police to enter the defendant's storage unit or view the items within it, unlike the search in this case. 697 N.W.2d at 202-03. Finally, the search in *Larsen* involved an ice-fishing house, which obviously contains fewer personal effects than a home. 650 N.W.2d at 146.

Yuma, Arizona allows tenants to elect to not have their home inspected. Yuma, Ariz., City Code tit. 13, ch. 138, § 138-06(F) (2017). When a tenant notifies the city of the tenant's decision not to have an inspection, the city may not inspect the tenant's home "unless there is probable cause to believe that a violation of the Housing Code exists in the dwelling(s) sought to be inspected." *Id.* Brentwood, California requires periodic rental housing inspections, but the inspections are only of the exterior of the home. Brentwood, Cal., Municipal Code tit. 8, ch. 8.44, § 8.44.040 (2017). Perhaps the most obvious solution is to require landlords to allow the city to conduct a rental inspection when the unit is unoccupied between tenant rentals. These simple alternatives suggest that it is premature to conclude, as the court does here, that the City has no alternative methods of enforcement.

Therefore, because the housing inspections infringe on the tenants' significant privacy interests and alternate means of enforcement are available, I would conclude that under our established balancing test, performing the rental housing inspection at issue in this case without individualized suspicion also violates the reasonableness clause of Article I, Section 10.

## IV.

Finally, I turn to the procedures that the court holds district courts must follow when considering petitions for administrative search warrants. In essence, the court requires that tenants receive notice and an opportunity to be heard—although these requirements can be dispensed with if there is a "compelling need." The court also encourages district courts to impose restrictions on the timing and scope of the warrant. Aside from the complete absence of any of these requirements in either the Fourth Amendment or Article I, Section 10, I lack the court's optimism about the effectiveness of judicially imposed administrative warrant restrictions. Under the court's formulation, by definition, the government does not need to allege any individualized probable cause to search. A simple declaration that it is time for a search is enough. And keep in mind the almost limitless scope of the government's various regulations, which makes it unclear what restrictions a judicial officer could impose in issuing an administrative warrant for a search. Perhaps the court means that a district court could prohibit the inspector from looking in closets—but that cannot be so because closets have walls that might contain cracks and the City's inspection checklist lists "[h]oles in walls" and "[c]racks or chipping" on walls as items that the inspector must look for. Closets also might contain outlets with faulty electrical wiring that does not comply with the city housing code. Furthermore, the inspector might need to open closet doors to ensure the doors are operable because "[e]very interior door ... shall be capable of being opened and closed by being properly and securely attached to jambs, headers or tracks as intended by the manufacturer of the attachment hardware." 2012 Int'l Prop. Maint. Code § 305.6.

Perhaps the court envisions that a district court could prevent the inspector from searching under the tenant's bed—but, of course, a bed could be placed on top of a hole in the floor or might obscure portions of the wall that need to be searched for cracks because the City's inspection checklist states that the floor must be "[f]ree of cracks/holes/rips etc." Electrical outlets can be found behind and under beds as well.

Perhaps the court believes that a district court could prevent an inspector from rummaging through kitchen cabinets—but kitchen cabinets could contain evidence of

insect or rodent infestation. *See* 2012 Int'l Prop. Maint. Code § 309.1 ("All structures shall be kept free from insect and rodent infestation."). The code seems to anticipate searching in cabinets because it states: "Flexible cords shall not be used for permanent wiring, or for running through doors, windows, or *cabinets*," *id.* § 605.4 (emphasis added).

Perhaps the court hopes that the district court could at least prevent an inspector from searching a freestanding dresser—but alas, because the housing code contains a minimum square footage requirement for bedrooms based on the number of occupants, *see id.* § 404.4.1, and a dresser could contain clothing or other items that prove the tenants are violating these occupancy requirements, it is possible that the housing inspector could search through the dresser. *But see Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 581-82 (7th Cir. 1999) (holding that a housing inspector could not open drawers and closets to look for evidence of violations of maximum occupancy requirements because the warrant did not state with particularity that the housing inspector was searching for violations of that section of the city code, and leaving open the question of whether a warrant that stated such a purpose with particularity would violate the Fourth Amendment reasonableness requirement). In fact, because the Golden Valley City Code requires "[e]very occupant of a structure [to] dispose of garbage in a clean and sanitary manner by placing such garbage in ... approved garbage containers," *id.* § 308.3, the inspector might need to open all unapproved containers to ensure that they do not contain garbage. *See* Golden Valley City Code § 4.60, subd. 1 (adopting the 2012 International Property Maintenance Code as "a part of this Section as if set out in full herein and [stating that it] shall be referred to as the Golden Valley Property Maintenance Code"); *2012 Int'l Prop. Maint. Code* § 308.3 (emphasis omitted).

Furthermore, the procedure that the court envisions presupposes a tenant with the wherewithal, financial and otherwise, to put the government's planning, zoning, building inspection, and legal departments to the test. The court's proposed procedures, although well intentioned, illustrate the fundamental flaw of the city's argument and the court's decision: the court has to invent procedures to make Golden Valley's scheme appear to pass constitutional muster. And, the court puts the burden on the tenant to figure out how to prevent the constitutional invasion rather than placing the burden on the government to explain why, using our traditional concepts of probable cause, the court allows the government to burden fundamental privacy rights. Article I, Section 10 does not delegate this authority to the government, and I disagree with the court's decision to grant this power.[13]

---

**13.** There is a common misconception that the courts are the only guarantors of our constitutional rights. The reality is more complex. Constitutional rights also are vindicated by legislative and executive action, as well as by individual citizen advocacy. For example, after the United States Supreme Court issued its decision in *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), governors, legislators, and voters swiftly responded with new legislation and constitutional amendments addressing eminent domain actions. *See, e.g.*, Fla. Const. art. X, § 6(c) (amended in 2006); Mich. Const. art. X, § 2 (amendment ratified in 2006); Miss. Const. art. 3, § 17A (effective in 2012); Nev. Const. art. 1, § 22 (added in 2008); N.H. Const. pt. 1, art. 12-a (added in 2006); Ariz. Rev. Stat. Ann. § 12-1134 (2016) (adopted in 2006); Iowa Code § 6A.22 (2016) (adopted in 2006); Kan. Stat. Ann. § 26-501a (2016) (adopted in 2006); Minn. Stat. § 117.025, subd. 11 (2016) (adopted in 2006).

It is unfortunate that the court has chosen not to recognize that government must have

### V.

In short, the administrative search warrant that the City seeks violates both the warrant and the reasonableness clauses of Article I, Section 10. Therefore, I respectfully dissent.

STRAS, Justice (dissenting).

I join in Parts I and II of the dissent of Justice Anderson.

---

probable cause, as that term has long been understood, to search a tenant's home. But I

suspect the court's opinion will not be the last word on this topic.